

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-143-CR**

RHONDA ORR
APPELLANT

V.

THE STATE OF TEXAS
STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## OPINION

------------

## I. Introduction

A jury found Appellant Rhonda Orr guilty of first-degree arson resulting in the death of her husband, James Orr,[1] and assessed her punishment at eighty-eight years' imprisonment. In seven points, Rhonda challenges the legal

---

[1] The offense of arson is a first-degree felony if a person suffers bodily injury or death "by reason of the commission of the offense." Tex. Penal Code Ann. § 28.02(a)(2)(A), (d)(1) (Vernon 2003).

and factual sufficiency of the evidence to support the arson verdict, the legality of the search of her home on October 16, 2003, the admissibility of testimony by the State's expert witness, the admissibility of autopsy photographs, the trial court's ruling on the State's closing argument, the trial court's denial of her motion for mistrial, and the trial court's definition of "reasonable doubt" in its jury charge. We affirm.

## II.    Procedural Background

A grand jury indicted Rhonda in February 2004. The indictment alleged that Rhonda started the fire by igniting a combustible substance knowing that the house was within the limits of an incorporated city or town with intent to damage or destroy the house and that James Orr died as a result of the fire. Rhonda pleaded not guilty. Her case was tried in March 2008, at the conclusion of which the jury returned a verdict of guilty and assessed punishment at eighty-eight years' confinement.

## III.    Factual Background

Rhonda and James Orr married in 1999. James, who was disabled from a childhood injury and confined to a wheelchair, died in a house fire in the early morning hours of May 14, 2003. The State's theory at trial was that Rhonda, motivated by insurance money, intentionally started the fire that killed James. Rhonda contended that she and James, although in the process of a divorce,

did not have a contentious relationship and that the cause of the fire could not be determined.

Former Little Elm Police Officer William Miller[2] received a 9-1-1 dispatch around 3:45 a.m. that the fire department was en route to a house fire with a person still inside the house. He arrived "really quickly," noticed smoke coming out of the house, and saw Rhonda, her daughter, and neighbors standing outside. Rhonda rushed up to him, pointed him to her house, and said her husband was still in the back bedroom. Rhonda told Officer Miller she had tried to get her husband out of the house but he had kicked her away and shut and locked the door.

Officer Miller said Rhonda went with him to the front door area of the house where she pointed him toward the master bedroom door. He then went into the house alone and found the door to the master bedroom locked. He called out for James but heard nothing. Officer Miller kicked in the door, and chest-high smoke billowed out of the room. Officer Miller entered the room and found the wheelchair but did not find James.[3] He retreated toward the

---

[2] Officer Miller worked eight years as a police officer with the cities of North Richland Hills and Little Elm. He left the Little Elm Police Department in February 2004 to work for the United States State Department. At the time of trial, Officer Miller worked for the State Department in Diplomatic Security Services.

[3] Officer Miller said he noticed a strong concentration of flames around the far side of the bed and at both night stands. He also said he found a

3

driveway, taking Rhonda with him from the front-door area. Rhonda insisted James was in the bedroom, so Officer Miller made two more unsuccessful trips into the master bedroom to find James. The fire and increasing smoke caused Officer Miller to lose his breath and start choking, and parts of the ceiling fell on him as he searched the master bedroom. Concerned for his own safety, Officer Miller felt he had to leave the house. Officer Robert Walton arrived near this time, and, trying to find a way into the house, he and Officer Miller went to the back of the house. Officer Miller kicked out the back window to the master bedroom with his foot, getting his boot caught in the window in the process, and causing air to rush in and the flames then to rush out.

When the fire department arrived, Officer Miller returned to the front of the house and apologized to Rhonda for not finding James. He was then care-flighted to Parkland Hospital for treatment. Officer Miller later learned James was found in the bathroom near the toilet; he testified he might have found James had he been told there was a restroom in the bedroom. Officer Miller said Rhonda seemed upset at the scene of the fire. In addition, he said that although she had not previously done so, Rhonda insisted on going back inside the house once the fire department arrived.

---

wheelchair in the room, close to the door, and eighteen inches to two feet from the bed.

Bart Vest, a firefighter-paramedic with the Frisco Fire Department, said he arrived at the scene of the fire to assist in treating any victims, and said he understood two police officers and a pregnant female (Rhonda) had smoke inhalation. Vest testified Rhonda did not want any treatment and insisted that someone get her husband out of the house. Vest said Rhonda appeared upset and wanted the efforts directed to her husband, who was in a wheelchair and could not get out of the house on his own.

Robert Wren O'Neal and his wife, Lindsey O'Neal, lived next door to Rhonda and James. O'Neal testified that he and his wife had been awakened around 3:30 or 3:45 a.m. on May 14, 2003, by Rhonda's "frantic knocks" at their front door. Rhonda, who stood at the door with her daughter Amanda,[4] said that her house was on fire and that James was still inside. Lindsey O'Neal called 9-1-1 because Rhonda said she had not done so.

O'Neal testified that Amanda stayed with his wife and that he went next door with Rhonda. He could hear the smoke detectors going off and saw the entryway full of smoke. He recalled that Rhonda frantically screamed that James was locked in the master bedroom. O'Neal went down the hallway with Rhonda to the door of the master bedroom, but the door was locked. The doorknob was hot, and black smoke billowed out from the top, bottom, and

_____

[4] Amanda is Rhonda's daughter but James is not Amanda's father.

5

sides of the door. O'Neal and Rhonda yelled James's name and could hear James moaning or grunting; O'Neal said James sounded like he was in severe pain. Because O'Neal did not feel safe in the house, he and Rhonda then went outside the house to the driveway, although O'Neal acknowledged Rhonda was hesitant to leave. O'Neal said no one else was around until Officer Miller arrived in a "couple [of] minutes or so." O'Neal testified that Rhonda was in his presence from the time she knocked on his door until Officer Miller arrived, that Rhonda did not go into the house with Officer Miller, and that Rhonda could not have gone into the house without his knowledge.

O'Neal said it seemed unusual that Rhonda parked her car across the street in front of a neighbor's house the night of the fire because she typically parked her car in the driveway or in the garage; he had not previously seen it parked across the street. O'Neal also said James usually parked in the driveway or on the street in front of the Orrs' house, but his car was parked on the street between the Orrs' house and the O'Neals' house on the night of the fire.

Lindsey O'Neal testified Rhonda did not have time to go into the house by herself because her husband left with Rhonda immediately after Rhonda told them that there was a fire and that James was in the bedroom. She also testified that, after the fire, Rhonda asked her to lie and say that she was the

6

pregnant woman at the scene, not Rhonda, because no one knew that Rhonda was pregnant and that James was not the father. Lindsey O'Neal also said she believed Rhonda was "fake crying" when the rescue workers removed James's body from the house.

Captain Shawn Russell of the Little Elm Fire Department testified that he received a call about a house fire with a handicapped person trapped inside. He testified that there were heavy fire conditions when he entered the house to find the master bedroom. He could not see his hand in front of his face and he was "pretty much on [his] belly crawling around." Captain Russell found James in the back of the bathroom, sitting Indian-style, and slumped over with his hands between his legs. James had no pulse, appeared burned, had a lot of black around his mouth and chin, and was lifeless. About that time, the Frisco Fire Department arrived and helped get James out of the house. The Frisco paramedics then took over and tried unsuccessfully to resuscitate James. Dr. Gary Sisler, a deputy medical examiner for Tarrant, Parker, and Denton counties, testified that James died from smoke inhalation and thermal burns covering eighty percent of his body.

Donald Diviney is a former sergeant in the Criminal Investigation Division of the Little Elm Fire Department. He responded to the fire and, upon arriving,

spoke with Officer Miller, Wren O'Neal, and fire department personnel. He also spoke briefly with Rhonda about Officer Miller's attempts to rescue James.

Diviney said he further interviewed Rhonda around 9:30 a.m. that morning after she returned from the hospital. Rhonda told him James had wheeled through the living room the night before while she and Amanda watched television and "was bragging" about being "toasted." She also told Diviney that James was taking Flexeril.

According to Diviney, Rhonda told him there had been a fire in the house earlier in the evening that they had extinguished. Diviney said Rhonda told him she saw a bottle of alcohol that had tipped over, a clock radio hanging by its cord, and a tipped-over candle on the night stand closest to the bedroom door. Diviney believed that Rhonda was implying that the earlier fire started because James was intoxicated from alcohol and Flexiril and had knocked over the candle.

Rhonda told Diviney she was awakened later by the alarm from the new fire. She said that when the second fire woke her up, she first tried to get into the master bedroom but could not. She told Diviney she then took Amanda to the neighbors' (the O'Neals') house. After returning from the neighbors' house, and apparently finding the bedroom door open, she went inside, found James on the floor, and tried to get him out. Rhonda told Diviney that there were a

8

lot of flames and smoke in the room and that the bed had already burned to the point where the bedsprings were visible. She also told Diviney that James struggled with her between the bed and doorway, that James kicked her away, that the door slammed shut, and that she could not get the door open. Rhonda said she then went back to the neighbors' house and returned with Mr. O'Neal. However, Diviney testified that unless the O'Neals were lying, there was no possibility that Rhonda went into the house and struggled with James as she claimed to have done because Mr. O'Neal was "very clear" that he was with Rhonda until emergency personnel arrived.

Diviney further testified that he and Dave Wallace accompanied Rhonda into the house later on the morning of May 14, 2003, so that she could retrieve toiletries and other personal items. They were in the house less than five minutes, and Diviney stayed with Rhonda the entire time. Diviney said Rhonda did not take any folders containing insurance policies out of the house with her.

Thomas Stocks was Rhonda's and James's Farmer's Insurance agent. Stocks testified that James and Rhonda had a Farmer's homeowner's policy with $176,000 on the dwelling and $108,000 for personal effects. James also had a $250,000 twenty-year term life insurance policy naming Rhonda as the beneficiary. Stocks said Rhonda called him at about 2:20 p.m. on the date of the fire and advised him that "[w]e had a loss, a fire," and they discussed the

9

damage. Stocks said that they talked for more than twenty minutes about the logistics of making a claim and getting repairs done. Stocks said that he had no idea that something worse had occurred, but that at the end of the conversation, Rhonda said, "Oh, we lost Jimmy today." Stocks said that Rhonda had no inflection or feeling in her voice and that her tone was "[j]ust like you and I would talk about mowing the grass."

Stocks further testified that, on the application for the Farmer's life insurance policy, the question as to whether there was any other life insurance in force or pending at the time of the application was answered "no." Stocks stated he did not know that there were other life insurance policies on James's life at the time of his death.

Ron Keaton, an investigator for the Denton County district attorney's office, discovered that Rhonda and James had over $1 million in applicable insurance. In addition to the Farmer's homeowner's and term-life policies, Keaton identified two Cigna life insurance policies totaling $150,000, a Monumental Insurance Company life insurance policy with a $225,000 rider, a CUNA $100,000 accidental death policy, and a $200,000 policy with Fidelity and Guaranty Life Insurance Company. Rhonda was a beneficiary under each policy.

Keaton testified that the insurance records showed Rhonda took out the Monumental policy on February 15, 2003, three months before James's death, and that Rhonda called Monumental at 2:01 p.m. on May 14, 2003. Keaton also said Rhonda contacted Farmer's at 12:25 p.m. on May 14, 2003, less than eight hours after James's death, and that she called CUNA at 2:57 p.m. the same day. Rhonda also contacted Cigna within eight hours of James's death. Keaton did not know exactly when Rhonda contacted Fidelity and Guaranty Life Insurance Company, but he said the company had already sent Rhonda a written response by May 20, 2003.

Texas Ranger Tracy Murphree interviewed Rhonda on June 19, 2003. Ranger Murphree videotaped the interview, and the State published the video to the jury. During the video, Ranger Murphree asked Rhonda about the differences between her version of events and those of her daughter and the O'Neals. Rhonda told Ranger Murphree that James said he was toasted, that there was an earlier, smaller fire that James put out, that she struggled with James while trying to rescue him from the second fire, and that he had kicked her out of the room and locked the door. Rhonda denied culpability and was released after the interview.

Ranger Murphree testified that, contrary to Rhonda's version of the events, neither alcohol nor Flexeril was found in James's system. Ranger

11

Murphree said he never had any reason to doubt either of the O'Neals' veracity and that he could not reconcile Rhonda's version of events, including her alleged struggle with James while trying to rescue him, with the O'Neals' statements that Rhonda could not have gone inside to struggle with James as she described. On cross-examination, Ranger Murphree agreed that Rhonda's daughter said Rhonda went into the house for about twenty seconds before taking her to the O'Neals' house. However, Ranger Murphree said Rhonda did not have soot in her nose or in her mouth, even though Rhonda claimed the fire was rather large at the time of the struggle. Ranger Murphree also pointed out that, in June, Rhonda had denied knowing about the existence of the multiple insurance policies, but she had contacted all of the insurance companies on the day of the fire in May.[5]

Jeffrey Bowery was a deputy fire marshal for Denton County in May 2003 and went to the scene early on the morning of the fire to take photographs. Bowery said he initially believed the fire started between the foot of the bed, the dresser, and the bedroom entrance, but said he later concluded there was a second point of origin between the bed and the bay window

---

[5] Ranger Murphree acknowledged that he threatened capital murder charges at the end of his interview of Rhonda and that he believed he had probable cause for her arrest on that charge but that such a charge was never filed.

toward the back of the house. Although he agreed a fire is fueled by oxygen and would burn toward an open window, Bowery did not believe the broken window caused deeper charring near the window. Bowery also testified he did not believe there was a point of origin where Rhonda said the candle fell over because there was far less charring in that area.

Raiford ("Ray") Powell testified as an expert witness for the State. He started fire investigation in 1971, authored a book on fire pattern recognition in 1999, and is an instructor teaching fire origin and cause and fire pattern analysis for police and fire departments across the United States and in several other countries. Powell has performed private investigations since 1992 and believes he has investigated more than 2,500 fires.

Powell's opinion was that someone intentionally set the fires because there was more than one point of origin. He explained his opinion by discussing the charring and the burn patterns on several items within the room. Powell said a char analysis looks at the depth of the burn into wood and explained that fire plumes create patterns as they burn.

Powell asserted that one point of origin was near the window and that it was caused by a combustible substance. He maintained that the charring on the bed posts and night stands suggested the fire burned longer on the window-side of the room. The burn patterns on the night stand on that side of the room

and the headboard also showed that more fire burned on the window-side of the room and that the fire moved toward the bathroom.  A candle on the other night stand away from the window did not melt—the candle was still wrapped in paper, which would have been burned off, and the candle would have melted if it had started the fire—and the night stand itself was hardly charred.  The bed springs collapsed on the side of the bed near the window but not on the other side, and there was still mattress fabric and foam rubber remaining on the side of the bed away from the window.

Powell believed the fire near the window was caused by a combustible substance, possibly Wild Turkey liquor.[6]  He said something "brought the fire all the way down onto the floor," so much so that the carpet-tack strip under the window was charred and burned.  Powell explained that fire usually burns upward, so an ignitable, combustible substance must have been used to cause the fire to burn the carpet-tack strip.

Powell testified he believed the second point of origin was in the area of the room toward the room entrance.  The chest of drawers had heavier charring on the side toward the room entrance and the other side did not burn, which

_____

[6] Margaret Corn, Fire Marshal for the City of Little Elm at the time of the fire, testified she participated in the investigation of the scene on the morning of the fire while the cleanup was still in progress.  She testified that she and another investigator found glass on the floor by the bed that they believed was a portion of a Wild Turkey whiskey bottle.

was also a strong indicator to him that the fire by the window did not spread to the other side of the room. Powell also said the closet door in that area was almost completely consumed by fire. Powell stated his opinion was consistent with Officer Miller's recollection of seeing two separate fires in the room before he later broke out the window.

Powell also discussed the carpet-tack strip and baseboard between the entrance door and the chest. He said the exposed carpet-tack strip was burned, meaning the hottest part of the fire was on the floor "where there's something liquid most probably burning." Powell said the fire was quickly extinguished and did not burn long enough for it to burn "down" and smolder on the floor in a way that would cause that much damage, but had to have been a fire that burned "up." Thus, Powell believed the burn patterns and fire patterns showing that the fire was at floor level indicated a definite and distinct second point of origin, also caused by a combustible substance like gasoline, kerosene, or alcohol.[7] An investigative dog that was brought in during the

---

[7] Powell testified there was a third point of origin in the bathroom as well. When he revisited the house in May 2005, sheetrock had been removed and the bedroom and bathroom had been cleaned for reconstruction. He found a burned area inside the wall behind the bathtub; he did not see this area in 2003 because the bathtub had not yet been removed. Powell said that he had determined that this area of fire had to have been started by an ignitable liquid, possibly alcohol.

investigation was not trained to identify alcohol, so Powell said it would not have picked up the odor of alcohol.

Powell stated that the two insurance investigators each found one of the two separate points of origin he found in the bedroom. One identified a point of origin near the window, and the other found an area of origin closer to the room entrance. Explaining his ultimate conclusion that the fires were intentionally set, Powell testified that "[t]he fires had to be set if they're not connected together . . . [b]ecause there's no way they communicated one to the other."

On cross-examination, Powell agreed that the rate of fire growth as recorded by witnesses is not always reliable evidence of an incendiary fire. Powell also acknowledged that there would have been some ventilation from the door to the window when the officer kicked out the window and that inflow of oxygen to a fire can cause mistaken burn patterns. But he explained that mistaken patterns take time to occur whereas the main part of the fire was of short duration. Powell also maintained that the broken window did not cause additional charring because the side closest to the oxygen source (the window) would have charred less. Because more charring occurred on the side of the room toward the window, he could not say the ventilation toward the window caused the additional charring.

Three of James's friends testified at trial. Brock Fischer said he first learned that James and Rhonda had marital troubles when he talked with james on May 1, 2003. Fischer was going to help James move to an apartment the following Saturday after the fire. He said James seemed depressed or concerned but not suicidal. James worked with Christopher Tunks, and Tunks knew James and Rhonda were separating. Tunks testified he was scheduled to help James move into the apartment three days after the fire, had James not died. Tunks testified that he believed James was excited and looking forward to starting a new chapter in his life, that James was not depressed that Rhonda had a new boyfriend and was pregnant, and that he had no indication James would consider suicide. Tunks remembered seeing Rhonda at James' funeral joking and being very affectionate with her boyfriend.

Loretta Caretti said she believed James was "a wonderful, very wonderful person." Caretti also said Rhonda was giggling and laughing with her boyfriend during the entire memorial video shown at the funeral. When asked if Rhonda cried at the funeral, Caretti stated: "She was not crying. She was laughing." Caretti also said Rhonda sat in her male companion's lap during the wake at a relative's house just hours after James was buried.

Four of Rhonda's friends testified on her behalf. Carol Jones said that she had known Rhonda since 1999 and that Rhonda was a "very caring, doting

17

wife." Tamra Holden said Rhonda is a "very tender-hearted, sweet mother and tender person, compassionate, always kind of a nurturer." Jill Hanrahan testified she believed Rhonda to be non-violent and truthful.

Angela Short is Rhonda's best friend and has known Rhonda for twenty years. Short said she had seen Rhonda and James together for several hours the Sunday before the fire; they were laughing and "getting along great." Short said she knew Rhonda and James previously agreed to separate and were living in separate bedrooms for about five months. However, she said their interaction the Sunday before the fire was typical of their interaction the previous five months. Short also said Rhonda was in a daze for several weeks after the fire and "could not believe that [James] was gone."

Short said Rhonda did not have a lot of money and did not own any property. She testified that James's parents employed Rhonda, paid Rhonda and James's rent, paid Rhonda's tuition, and did not know Rhonda was pregnant with another man's child. Short said she attended the funeral and wake; she specifically denied that Rhonda sat in her boyfriend's lap during the wake and said Rhonda did not even sit with her boyfriend during the funeral.

Jennie Mannie is a real estate agent who consulted with Rhonda and James about selling their house. She visited their home in May 2003 and said four people were there at the time: James, Rhonda, Rhonda's daughter, and

18

Rhonda's boyfriend. She said that James agreed with the plan to sell the house and that she understood Rhonda would receive all proceeds from the sale. Mannie also testified, however, that Rhonda and James were keeping their pending divorce and house sale from James's mother, so they did not want a sign in their yard and wanted the realtor's lockbox hidden from view.

Dr. Gary Wimbish, board certified in forensic toxicology, testified for the defense that he reviewed James's autopsy report and that James had Benadryl in his system in a much greater dosage than he would expect for therapeutic use or controlling allergies. Dr. Wimbish explained that the likely symptoms of that dosage would be sleepiness, drowsiness, agitation, and confusion. The concentration of the medicine would eventually cause a person to go to sleep. He said if the timing of the Benadryl dosage and the fire were close together, it is possible the carbon monoxide from the fire would add to the confusion. Dr. Wimbish was of the opinion that a person with this amount of Benadryl in his system, if awoken by a person or smoke alarm, would likely be disoriented and confused.

Dr. Wimbish further testified that Benadryl and alcohol work together to increase symptoms of confusion and lethargy. He said that a person of James's size could have four to five drinks and not have alcohol in his system several hours later. However, Dr. Wimbish acknowledged that he had no

information as to when James drank alcohol, that he assumed James stopped drinking by 9:30 p.m. the night before, and that he did not know how much James had to drink. Dr. Wimbish also said Flexeril has a half-life of six hours, but acknowledged there was no Flexeril found in James's system.

Michael Keller also testified as an expert witness for Rhonda. Keller started working as a firefighter with the City of Richardson in 1973 and later served in various police departments before moving into fire and arson investigation units. Keller has been in private business doing insurance investigations for the last fifteen years and has taught courses at various seminars in the metroplex area and a fire and arson investigation course at a police academy. He testified that he first investigated the scene of the fire at the request of a Farmer's insurance adjuster on May 16, 2003, and that he found insufficient evidence to prove the origin or cause of the fire.

Keller was of the opinion that there was not an area of origin near the window. He reached this conclusion because the ventilation from the broken window distorted the burn pattern; there was still sheetrock and a large part of the window frame remaining; there was no deep charring of the ceiling joists in the area, indicating the ceiling remained intact through most of the fire; the heavy sooting near the window actually indicated that it was hotter on the other side of the room (because sooting otherwise burns off); and all his

findings near the window were consistent with ventilation as opposed to a separate point of origin. He also testified that the carpet-tack strip could have been burned by ventilation or something else burning on the floor and that there was not enough damage to the night stand on the window-side of the bed to indicate there was a second point of origin near the window.

Keller saw "heavy damage" near the foot of the bed and toward the entry door of the master bedroom. In Keller's opinion, the fire spread from there toward the window and ventilation from the window caused the heavy damage near the window.

Keller testified he did not find an ignition point or a clear-cut point of origin. He also said that he did not think an accelerant was used and that he would usually find evidence of an accelerant when an amateur started the fire. Keller placed no significance on the collapsed bed springs because he said the prior use of the bed affects how the bedsprings collapse and said the bed springs could collapse at temperatures as low as 400 degrees. He said he did not do any char analysis and did not spend much time analyzing the bedposts because he knew there was a large fire in the room and because ventilation

distorts the burn pattern.[8]  Keller also testified a responsible investigator could not say the charring near the bathtub definitively occurred on May 14, 2003.

Keller testified that without evidence to prove the cause and origin of a fire, the cause of a fire must remain "undetermined."  Because he could not rule out possible accidental causes, Keller testified he could not say the fire was intentionally set and concluded the cause of the fire was "undetermined."

On cross-examination, Keller admitted that he incorrectly identified the night stands and the sides of the burned footboard in his report, meaning his report incorrectly set forth which night stand and portion of the footboard was more severely burned.  He also agreed the burned carpet-tack strip was consistent with low burning or a point of origin in the area.  Keller acknowledged that a third investigator placed the area of origin near the window and that the State's expert, Powell, identified both of the areas of origin found by Keller and the other expert.  Keller also agreed that Farmer's, the company for which he investigated the fire, ultimately disagreed with him and concluded the "loss was not accidental but was instead due to an incendiary fire that was caused by [Rhonda]."  Finally, Keller acknowledged that

---

[8] Keller admitted on cross-examination, however, that the applicable investigation manual says many things affect fire patterns, including ventilation and the type of wood, but that the manual does *not* say fire patterns have no value.  Instead, the manual suggests the investigator should be aware of and take into account any factors that might alter fire patterns.

multiple sources of unexplained fires are consistent with an intentional fire and that the occurrence of two totally unconnected fires is probably arson.

## IV.    Sufficiency of the Evidence

In her seventh point, Rhonda challenges the legal and factual sufficiency of the evidence supporting her conviction.

### A.    Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's

23

determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417.

**B.    Applicable Law**

A person commits the offense of arson if she starts a fire with intent to destroy or damage a building or habitation within the limits of an incorporated city or town. Tex. Penal Code Ann. § 28.02(a)(2)(A). The offense is a first-degree felony if a person suffers bodily injury or death "by reason of the commission of the offense." *Id.* § 28.02(d)(1).

"To establish the corpus delicti in arson cases it is necessary to show that a fire occurred and that the fire was designedly set by someone." *Mosher v. State*, 901 S.W.2d 547, 549 (Tex. App.—El Paso 1995, no pet.); *see also Troncosa v. State*, 670 S.W.2d 671, 680 (Tex. App.—San Antonio 1984, no pet.). A jury may infer intent from any facts that tend to prove its existence, such as acts, words, and conduct of the defendant. *See Christensen v. State*, 240 S.W.3d 25, 32 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are

24

also circumstances of guilt." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Each fact need not point directly and independently to the guilt of the accused, so long as the logical force of the probative evidence, when coupled with reasonable inferences to be drawn therefrom, is sufficient to support the conviction. *See Evans v. State*, 202 S.W.3d 158, 166 (Tex. Crim. App. 2006).

### C. Legal Sufficiency

The record contains legally sufficient evidence that Rhonda intentionally set the fire, and it is undisputed that James died as a result of the fire. The State's expert testified the fire was intentionally set because there were three points of origin, the points of origin did not communicate to one another, and the points of origin were caused by a combustible substance, possibly Wild Turkey liquor. The medical examiner testified James died from smoke inhalation and thermal burns covering eighty percent of his body. Several witnesses testified that Rhonda did not seem remorseful at the scene, at the funeral, at the wake, or on the telephone with the insurance agent, and that Rhonda contacted at least four insurance companies within hours of James's death. *See Ovalle v. State*, No. 03-08-00334-CR, 2009 WL 1708826, at *9–11 (Tex. App.—Austin June 19, 2009, pet. ref'd) (mem. op., not designated for publication) (finding legally and factually sufficient evidence of

25

arson and recognizing jury could infer intent from defendant's conduct before, during, and after the fire); *Fitts v. State*, 982 S.W.2d 175, 185–87 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (holding there was legally and factually sufficient evidence of arson where, among other things, defendant and State offered conflicting expert testimony of an incendiary fire and defendant cried more intensely when firemen were close to him, did not seem distraught at the scene, and gave inconsistent statements to the authorities). Rhonda gave implausible explanations of the fire and her efforts to save James and denied knowledge of the life insurance policies in June when she had already made claims on all of the policies in May. *See Guevara*, 152 S.W.3d at 50 (recognizing inconsistent statements and implausible explanations are circumstances of guilt); *Fitts*, 982 S.W.2d at 185–87.

There was evidence that Rhonda also had motive. James had decided to move out of the house and into an apartment the following Saturday. James's parents did not know—and Rhonda did not want them to know—that she and James had recently decided to immediately separate and divorce, that they had taken steps earlier the same month to sell the house, or that Rhonda was pregnant with another man's child. *See Guevara*, 152 S.W.3d at 50 ("Motive is a significant circumstance indicating guilt."). Rhonda was dependent upon James's parents for her income, and they were paying for the house and her

26

tuition for nursing school. Rhonda was the beneficiary on almost a million dollars of life insurance on James's life in addition to the insurance on the house. As argued by the State, Rhonda would need these funds if the truth came out and James's parents' benevolence ended, and she made claims on each policy within hours of the fire and James's death.

Viewing the evidence in a light most favorable to the prosecution, a rational jury could have determined beyond a reasonable doubt that Rhonda, with intent to destroy or damage the habitation, ignited a combustible substance in her Little Elm habitation, causing James's death. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. We hold that the evidence was legally sufficient to support the jury's verdict.

### D. Factual Sufficiency

#### 1. Rhonda's Contentions

Rhonda argues the evidence is insufficient to support her arson conviction because the evidence showed she attempted to rescue James, James acted in a bizarre and confused manner when she attempted to rescue him, and she had a caring disposition. Rhonda's friends testified Rhonda is non-violent, is truthful, and has a caring disposition, the first responders and police witnesses testified she seemed concerned and upset about James's being trapped in the fire, and expert testimony supported her theory that James was confused and

27

fought her efforts to save him by the combination of Benadryl and alcohol in his system. On the other hand, the State offered evidence that Rhonda did not attempt to rescue James from the burning bedroom as she claimed, that she was "fake crying" at the scene, that she contacted numerous insurance companies within hours of James's death, that she was laughing at the funeral, and that she sat in her boyfriend's lap at the wake. Further, even if Rhonda did attempt to rescue James, her rescue attempts do not render the evidence insufficient to establish arson because "the offense of arson is complete whenever the actor starts a fire with the requisite culpable mental state, whether or not damage of any kind actually occurs." *Mosher*, 901 S.W.2d at 549; *see also Wallace v. State*, Nos. 04-08-00421-CR, 04-08-00422-CR, 2009 WL 2265023, at *3 (Tex. App.—San Antonio July 29, 2009, no pet. h.) (mem. op., not designated for publication) (rejecting defendant's argument that he lacked requisite intent to damage or destroy building where defendant put the fire out and little damage occurred).

Rhonda also contends the evidence is insufficient because her expert witness "opined that he believed that the earlier fire had not been extinguished, was smoldering and then later caught on fire again which led to the victim's death" and because she offered a plausible explanation of how the fire started. However, Rhonda's expert witness stated only that a smoldering fire could

28

spread more quickly than a fire otherwise would. He did not say the earlier fire smoldered, later caught fire, and led to James's death. In fact, Rhonda's expert acknowledged on cross-examination that the "big fire" did not start in the area where Rhonda said the smaller fire occurred earlier in the evening. Further, the candle on the night stand where Rhonda claimed the earlier fire started did not melt during the "big fire." If the fire started in that area, the candle would have melted "into a puddle." Rhonda's expert also admitted the earlier, smaller fire did not cause the "big fire."

Rhonda next argues the evidence is insufficient because the State did not scientifically test the carpet for an ignitable substance, because ventilation through the window made any char analysis and inspection inconclusive, and because her expert witness testified the point of origin could not be determined. We disagree. The State offered evidence that the carpet-tack strip would not have burned like it did without the presence of an ignitable substance and that any ventilation through the window did not affect the char analysis. The State also offered expert testimony that there were at least two, possibly three, separate points of origin caused by a combustible substance, likely alcohol, and that the fires were intentionally set. And no evidence suggested that anyone caused the fires but Rhonda. Rhonda's complaints relate to conflicts between the testimony of the State's experts and Rhonda's expert, a classic battle of

29

experts. We must leave the resolution of those conflicts to the jury.[9] *See Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997) (holding that the weight to be given to "contradictory testimonial evidence is within the sole province of the jury, because it turns on an evaluation of credibility and demeanor.").

### 2. The Evidence is Factually Sufficient

In addition to the evidence discussed above, the record contains evidence that Rhonda told investigators James was drinking, had claimed to be "toasted," and was taking Flexeril the evening before the fire, yet James had no alcohol or Flexeril in his system. Rhonda told investigators she went into the house to rescue James after she took her daughter to the neighbors' house and that the fire was quite large at the time. But Mr. O'Neal testified he was with Rhonda the entire time and Ranger Murphree said Rhonda did not have soot in her nose or mouth after the alleged rescue attempt. *See Guevara*, 152 S.W.3d at 50; *Fitts*, 982 S.W.2d at 185–87. Rhonda also parked her car across the street from her house the night of the fire instead of in the driveway or garage and asked Mrs. O'Neal to lie to the police. Rhonda sought to prove an earlier fire (that James presumably caused) smoldered and caused the second fire, but

---

[9] We note that Rhonda's expert witness admitted that he incorrectly identified the night stands and footboard in his report and disregarded charring and burn patterns when the applicable manual instructs otherwise.

Rhonda's expert agreed the fire did not start near the alleged earlier fire, and one of James's friends testified that James was not suicidal. Rhonda denied knowing of various insurance policies in June when she had already contacted those insurance companies in May within hours of James's death. Finally, Officer Miller testified he might have been able to save James had Rhonda told him there was a bathroom connected to the master bedroom.

Reviewing all the evidence in a neutral light, we recall Rhonda's evidence that she made efforts to rescue James, that she seemed upset at the scene, and that she declined medical treatment because she wanted rescue efforts directed toward James. Rhonda's friends testified that she is an honest, caring person and that she was in a daze after James died. Her real estate agent testified that she and James had agreed she would receive all proceeds from the sale of the house. Rhonda also offered evidence that the Benadryl in James's system could have caused confusion when he was confronted by the fire. Finally, Rhonda's expert witness testified the cause of the fire could not be determined, mostly because of the ventilation from the window after it was broken by Officer Miller.

Viewing the evidence in a neutral light, we nevertheless conclude that a rational trier of fact could have found beyond a reasonable doubt that Rhonda, with intent to destroy or damage the habitation, ignited a combustible

31

substance in her Little Elm habitation, causing James's death. *See Ovalle*, 2009 WL 1708826, at *9–11; *Fitts*, 982 S.W.2d at 185–87. We cannot say that the evidence is so weak that the jury's determination was clearly wrong or manifestly unjust or that the conflicting evidence so greatly outweighs the evidence supporting the conviction that the jury's determination is manifestly unjust. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. We therefore hold that the evidence was factually sufficient to support the jury's verdict. We overrule Rhonda's seventh point.

## V. Motion to Suppress

In her first point, Rhonda contends the trial court erred by denying her motion to suppress evidence seized during a warrantless search of her home. On October 16, 2003, investigators conducted char analysis and took photographs of the Orrs' home without a search warrant. The trial court conducted a pretrial hearing on Rhonda's motion to suppress to consider whether investigators had actual or apparent authority to search the home on October 16, 2003. The State argued at the pretrial hearing and contends on appeal that James's parents, the Pooles, consented to the search and had actual or apparent authority to give valid consent. The trial court ruled that the Pooles had actual and apparent authority to give valid consent.

**A. Standard of Review**

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de

33

novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

**B.    Consensual Searches**

Consent to a search is an established exception to the constitutional warrant and probable cause requirements. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44 (1973); *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000). "The validity of an alleged consent to search is a question of fact to be determined from all the circumstances."

*Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002) (quoting *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S. Ct. 417, 421 (1996)). The State must prove valid consent by clear and convincing evidence. *Id.*

A warrantless search by law enforcement officers does not violate the Fourth Amendment's protection against unreasonable searches and seizures if the officers obtained the consent of "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171–72, 94 S. Ct. 988, 993 (1974); *see Illinois v. Rodriguez*, 497 U.S. 177, 179–82, 110 S. Ct. 2793, 2796–97 (1990). Third-party consent rests not on the laws of property but on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right." *Matlock*, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7; *see also Maxwell*, 73 S.W.3d at 281 (stating a legal property interest is not dispositive in determining whether a third party has the authority to consent to a search).

**C.    Analysis**

The trial court correctly concluded the Pooles had actual authority to consent to the search of the house on October 16, 2003. In considering whether the Pooles had the authority to consent, we look to whether they had

35

joint access or control over the house for most purposes so that it would be reasonable to conclude they had the right to consent and that Rhonda assumed the risk they might do so. *See Welch v. State*, 93 S.W.3d 50, 52 (Tex. Crim. App. 2002). Access and control for "most purposes" is unique in this case because the house was damaged by fire and uninhabited at the time of the search.

In this case, the trial court heard evidence at the pretrial hearing on the motion to suppress that before the fire, Mrs. Poole typically entered the house unannounced and uninvited when no one else was there and Rhonda never complained or told her not to do so; that Mr. Poole met the officers at the house and let them in on the day of the search; that the Pooles provided the money for the down payment and made all of the mortgage payments on the house; and that Rhonda knew the Pooles always had a key to the house. There was also evidence that, after the fire, Rhonda moved to Dallas to live with her mother, did not want to be near the house, and did not live in the house again after the fire; that Mrs. Poole entered the house two or three times to retrieve various items such as photos and mail— once at Rhonda's request; that Rhonda asked Mrs. Poole to let the fire marshal, insurance investigators, and a cleaning company into the house, that Mr. Poole let them in, and that Rhonda never complained about it; that a neighbor called Mrs. Poole when something needed

to be repaired at the house; and that Mr. Poole felt he had Rhonda's permission to let anyone into the house. The trial court also heard testimony from Rhonda and her mother that Rhonda did not give anyone permission to enter the house and that Rhonda told Mrs. Poole a week after the fire not to enter the house without Rhonda's permission.

A third party may give valid consent to search when that person "has equal control over and authority to use the premises being searched," *Maxwell*, 73 S.W.3d at 281 (citing *Matlock*, 415 U.S. at 171, 94 S. Ct. at 993), and the trial court could conclude by clear and convincing evidence that the Pooles had the right to consent. After the fire, no one lived in the house, the Pooles assumed the maintenance of the house, Rhonda did not want to be near the house, and Rhonda asked the Pooles to give investigators access to the house, making the Pooles her agent in that regard. *See Gabriel v. State*, 290 S.W.3d 426, 434 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding agency agreement allowing mailing center to accept mail for mailbox customer gave mailing center authority to consent to search of customer's mailbox). Although the testimony by Rhonda and her mother contradicted the Pooles' testimony, we must defer to the trial court's resolution of those conflicts. *See Amador*, 221 S.W.3d at 673; *Wiede*, 214 S.W.3d at 24–25. We hold the trial court did

not err by denying Rhonda's motion to suppress. We overrule Rhonda's first point.

**VI.    Admission of State's Arson Expert's Testimony**

Rhonda argues in her second point that the trial court erred by admitting the testimony of the State's fire investigation expert, Ray Powell, because Powell was not licensed to conduct fire investigations in Texas.

Texas Code of Criminal Procedure article 38.23 provides that no evidence obtained by an officer or other person in violation of the laws or constitutions of Texas or the United States shall be admitted in evidence against the accused on the trial of any case. Tex. Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005). Although article 38.23 seems to require exclusion of evidence tainted by every violation of Texas law, not every violation of law triggers article 38.23's exclusionary effect. *Miles v. State*, 194 S.W.3d 523, 528 (Tex. App.—Houston [14th Dist.] 2006), *aff'd*, 241 S.W.3d 28 (Tex. Crim. App. 2007). Instead, article 38.23's primary purpose is to deter unlawful actions that violate the rights of criminal suspects. *Carroll v. State*, 911 S.W.2d 210, 221 (Tex. App.—Austin 1995, no pet.) (citing *Roy v. State*, 608 S.W.2d 645, 651 (Tex. Crim. App. 1980)).

A defendant has no standing to complain about evidence seized in violation of Texas law unless the defendant's rights were invaded by the

38

seizure. *Chavez v. State*, 9 S.W.3d 817, 819 (Tex. Crim. App. 2000) (citing *Fuller v. State*, 829 S.W.2d 191, 201–02 (Tex. Crim. App. 1992), *cert. denied*, 508 U.S. 941 (1993), *overruled on other grounds by Riley v. State*, 889 S.W.2d 290, 301 (Tex. Crim. App. 1993)).

Rhonda's contention that Powell's testimony was not admissible because Powell was not licensed to conduct fire investigations in Texas is analogous to the defendants' arguments in *Chavez* and *Fuller*. *See Chavez*, 9 S.W.3d at 819; *Fuller*, 829 S.W.2d at 201–02. In *Chavez*, a police officer authorized by an agreement between several counties to investigate controlled-substance violations in the participating counties made an undercover cocaine buy from Chavez in a county that was not a party to the agreement. 9 S.W.3d at 818. Chavez argued the cocaine should have been suppressed under article 38.23 because the officer had no authority to act in the county where he made the buy. *Id.* The court of criminal appeals emphasized that Chavez claimed the cocaine should have been suppressed "*solely* because [the officer] obtained it from her outside the geographical boundaries set out in the Agreement. [Chavez] alleged no violation of any of *her* rights." *Id.* The court rejected Chavez's argument, holding that only the parties to the agreement had standing to complain about the breach of the agreement. *Id.* at 819.

39

In *Fuller*, the court of criminal appeals similarly held that article 38.23 did not require suppression of an incriminating audiotape that Fuller had given to a fellow inmate, that was stolen by a third inmate, and that was given to prison officials. 829 S.W.2d at 201–02. The court held the theft of the tape by the third inmate from the second inmate did not violate any of Fuller's rights; thus, Fuller did not have standing to complain about the theft, and article 38.23 did not require the tape's exclusion. *Id.* at 202.

The statutes implicated in this case are Texas Occupations Code sections 1702.101 and 1702.104(D); they prohibit a person from conducting an investigation into, among other things, the cause or responsibility for a fire unless the person holds an investigations company license. Tex. Occ. Code §§ 1702.101, 1702.104(D) (Vernon 2004). A person who is not licensed under chapter 1702 or who does not have a license application pending and who violates chapter 1702 may be assessed a civil penalty of $10,000 per violation, payable to the State. *Id.* § 1702.381(a) (Vernon 2004). It is undisputed that Powell did not hold such a license in October 2003 when he conducted his investigation at the house.

Like the defendant in *Chavez*, Rhonda argues the trial court should have suppressed Powell's testimony under article 38.23 *solely* because Powell did not have an investigator's license. *See Chavez*, 9 S.W.3d at 818. Rhonda

40

alleged no violation of any of *her* rights in the trial court, and she argues no such violation in this court. *See id.* Assuming Powell violated chapter 1702, the appropriate remedy is a civil fine payable to the State, not the exclusion of his testimony under article 38.23. Therefore, Rhonda lacks standing to challenge Powell's testimony under article 38.23. *See id.*; *Fuller*, 829 S.W.2d at 202. We hold the trial court did not err by overruling Rhonda's article 38.23 objection, and we overrule Rhonda's second point.

## VII.   Admission of Autopsy Photos

In her third point, Rhonda argues the trial court abused its discretion by admitting into evidence photos taken by the medical examiner during James's autopsy over Rhonda's relevance and unfair-prejudice objections.

The admissibility of photographs is within the sound discretion of the trial court. *Rayford v. State*, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003), *cert. denied*, 543 U.S. 823 (2004). "Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of the witness and the validity of his conclusions." *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000). Rule 403 provides that even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.*;

41

*see* Tex. R. Evid. 403. Rule 403 favors admissibility and "carries a presumption that relevant evidence will be more probative than prejudicial." *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002).

In reviewing a trial court's ruling on the admissibility of photographs, we consider several factors, including the number and size of the photographs, whether they are black and white or color, the gruesomeness, the detail shown, and "whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photograph[s] to the appellant's detriment." *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006), *cert. denied*, 549 U.S. 1056 (2006). Autopsy photographs are generally admissible unless they depict mutilation caused by the autopsy itself. *Hayes*, 85 S.W.3d at 816.

Dr. Gary Sisler of the Tarrant County Medical Examiner's Office testified that James died from smoke inhalation and burns to eighty percent of his body. The State offered four photographs of James's body through Dr. Sisler. The photographs in the record are four inches by six inches in size and show extensive burn injuries on James's face, torso, and limbs. There are no visible incisions from an autopsy examination; the only reference in the photos to the autopsy is the presence of a ruler bearing a date and case number.

42

In *Shuffield*, the court of criminal appeals held the trial court did not abuse its discretion by admitting victim photographs that showed only the injuries the victim received, close-up views of the victim's wounds, and a ruler to show the size of the injuries. *Id.* at 787–88. The pictures were three-and-one-half by five inches and black and white, but the court assumed color pictures were shown to the jury. *Id.* at 787. The court noted the pictures were no more gruesome than the crime scene as found by the police or than would be expected from the type of injury the victim suffered. *Id.*

Even assuming the jury in this case saw color photographs of James's body as it looked at the time of the autopsy, there were only four moderately-sized photographs, and the photographs are probative to depict the injuries James received as a result of the fire; moreover, they do not depict any mutilation caused by the autopsy. *See id.* at 787–88. The photographs are no more gruesome than would be expected from burn injuries over eighty percent of a person's body, and they corroborated Dr. Sisler's testimony to that effect. *See id.*; *Chamberlain*, 998 S.W.2d at 237. We hold the trial court did not abuse its discretion by admitting the photographs. We overrule Rhonda's third point.

43

## VIII.  Prosecutor's Closing Argument

Rhonda contends in her fourth point that the trial court erred by not sustaining her objection to the State's closing argument.  The prosecutor argued to the jury that Rhonda told her daughter to lie to the police and say James was drinking alcohol and intoxicated on the night of the fire.

To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement.  *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231–32 (Tex. Crim. App. 1973).

At trial, the trial court admitted into evidence a videotape of an interview between Ranger Murphree and Rhonda, and the State played the tape to the jury.  On the tape, Ranger Murphree told Rhonda that her daughter said that James did not wheel through the living room and say he was "toasted" and that her mom asked her to lie about the incident.  Ranger Murphree told Rhonda that her daughter was writing a statement; later, he left the room and returned with a piece of paper, showed it to Rhonda, and asked her if she recognized the writing on it.  Ranger Murphree then read from the paper, "He didn't drink that night; my Mom told me to say that."  Rhonda said that it looked like her

44

daughter's handwriting but that she did not "coach" her daughter to say anything.

> In closing argument, the prosecutor argued as follows:

> And then continuing on with the lies that she told in this case. Her own daughter, a 10-year-old, she tried to get her to lie to the police. And she told her daughter to tell the police that Jimmy was drinking. You may recall on the tape that [Rhonda] says that Jimmy was wheeling through the living room that night saying he was toasted, that he had been drinking. Amanda told the police --

At that point, Rhonda objected to the argument as outside the record. The trial court overruled the objection but instructed the jury that it had heard all of the evidence and could recall whatever evidence was brought to its attention.

Although no witness explicitly testified that Rhonda's daughter said that Rhonda told her to lie and say that James was intoxicated on the night of the fire, the jury did watch the videotaped interview in which Ranger Murphree confronted Rhonda with, and read from, her daughter's written statement.[10] The prosecutor's argument was thus a reasonable deduction from and summation of the evidence, and the trial court did not err by overruling Rhonda's objection to the argument. *See Felder*, 848 S.W.2d at 94–95 (holding argument a reasonable deduction from the evidence where medical

---

[10] Rhonda objected to the admission of the videotaped interview, but the trial court overruled her objections, and Rhonda does not complain on appeal about the admission of the videotaped interview.

examiner testified "brain death occurs when there is no brain activity or control," the medical records in evidence indicated victim had "no cerebral activity," and prosecutor argued the victim was brain dead). We overrule Rhonda's fourth point.

## IX. Prosecutor's Question Regarding Abortion

In her fifth point, Rhonda argues the trial court erred by overruling her punishment-phase motion for mistrial after the prosecutor asked Rhonda's mother when Rhonda aborted the child with whom she was pregnant at the time of the fire. Rhonda objected to the question as irrelevant and highly prejudicial. The trial court sustained the objection and instructed the jury to disregard the question, but the trial court overruled Rhonda's motion for a mistrial.

### A. Standard of Review

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard and "must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). "Only in extreme circumstances where the prejudice is incurable, will a mistrial be required." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). A mistrial is appropriate only for a narrow class of

46

highly prejudicial and incurable errors and may be used to end trial proceedings when the error is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.* (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000)).

"The asking of an improper question will seldom call for a mistrial, because, in most cases, any harm can be cured by an instruction to disregard." *Ladd*, 3 S.W.3d at 567. We presume the jury followed the trial court's instruction to disregard in the absence of evidence that it did not. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998); *Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). "A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Ladd*, 3 S.W.3d at 567.

**B.  Analysis**

A trial court must balance three factors in deciding whether to grant a motion for mistrial: (1) the severity of the misconduct (magnitude of the prejudicial effect), (2) the effectiveness of the curative measures adopted, and (3) the certainty of the punishment assessed absent the misconduct (likelihood of the same punishment). *Hawkins*, 135 S.W.3d at 77 (citing *Martinez v.*

*State*, 17 S.W.3d 677, 693–94 (Tex. Crim. App. 2000)); *see Archie*, 221 S.W.3d at 700.[11]

The Tyler Court of Appeals applied the *Mosley* factors in *Carnes v. State*, and although Carnes moved for a mistrial during the guilt-innocence phase of his trial, we find the court's reasoning instructive. *See* No. 12-06-00251-CR, 2007 WL 2178564, at *2 (Tex. App.—Tyler July 31, 2007, pet. ref'd) (mem. op., not designated for publication). During Carnes's felony sexual assault trial, the trial court sustained Carnes's objection but denied his motion for mistrial where the investigating officer testified he located Carnes's current photograph after he "found that [Carnes] was listed as a sexual offender." *Id.* at *1. The court of appeals analyzed the first and second *Mosley* factors as follows:

> The improper information that made its way into this jury trial was powerful. Appellant was on trial for sexual assault and one of the State's witnesses volunteered that he was "listed as a sex offender."
> . . . .
> The prejudicial effect is high. Although it was a single brief reference, the jury was told that Appellant was a sex offender, and he was on trial for sexual assault. The curative measures were

---

[11] Courts commonly refer to these factors as the "*Mosley* factors" and apply them to motions for mistrial in both the guilt-innocence and punishment phases. *See Archie*, 221 S.W.3d at 700; *Hawkins*, 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999). At the guilt-innocence phase, the third *Mosley* factor involves the certainty of conviction rather than the certainty of the punishment assessed. *See Archie*, 221 S.W.3d at 700; *Mosley*, 983 S.W.2d at 259.

immediate and direct. The trial court told the jury not to consider the inappropriate answer in any way.

*Id.* at *2. Analyzing the third *Mosley* factor, the court recognized that credibility determinations were central in the case and that the certainty of the conviction could not be determined from the "cold record." *Id.* However, the court noted the trial court was in the best position to make the necessary determinations. *Id.* at *3. The court then held that the trial court did not abuse its discretion because the court could not conclude that the trial court's decision to deny the motion for mistrial fell outside the zone of reasonable disagreement. *Id.*

As in *Carnes*, we cannot say the trial court abused its discretion in concluding its instruction to disregard the improper question cured the error. *See id*. at *2–3. The prejudicial effect of the question concerning Rhonda's alleged abortion was high, but the trial court correctly sustained Rhonda's objection and quickly instructed the jury to "disregard the last question by the prosecutor."

In the absence of evidence that it did not, we presume the jury followed the trial court's instruction to disregard the improper question. *See Colburn,* 966 S.W.2d at 520. The trial court orally instructed the jury to disregard the improper question, and the court's charge instructed the jury that, for sustained

objections, the jury could not "conjecture as to what the answer might have been or as to the reason for the objection."

Rhonda contends her eighty-eight year sentence suggests the jury did not follow the trial court's instruction because Rhonda was eligible for probation and because the jury heard no evidence of her prior criminal history. We disagree. The punishment range for first degree felonies is five to ninety-nine years or life. *See* Tex. Penal Code Ann. § 12.32 (Vernon 2003). And "'the sentencer's discretion to impose any punishment within the prescribed range is essentially unfettered,' and . . . a punishment that falls within the legislatively prescribed range, and that is based upon the sentencer's informed normative judgment, is unassailable on appeal.'" *Franco v. State*, No. 08-06-00280-CR, 2007 WL 2200468, at *5 (Tex. App.—El Paso Aug. 2, 2007, pet. ref'd) (not designated for publication) (quoting *Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006) (considering length of sentence when analyzing *Mosley* factors)).

Rhonda's sentence is within the prescribed range of punishment and is less than the life sentence the State requested. *See* Tex. Penal Code Ann. § 12.32. There was abundant evidence by which a jury could have found Rhonda deserving of the sentence that she received; the jury found Rhonda guilty of starting a fire (that caused her husband's death) with the intent to destroy or

damage the house. *See id.* § 28.02(a)(2)(A), (d)(1). This alone could be sufficient for the sentence Rhonda received. Given that the jury had considerable latitude in assessing punishment, and in fact assessed punishment within the statutory range for Rhonda's first degree felony, we cannot conclude the jury did not follow the trial court's instruction to disregard the improper question. *See Franco*, 2007 WL 2200468, at *5.

The trial court correctly sustained Rhonda's objection and quickly instructed the jury to disregard the improper question. Under the circumstances of this case, we cannot conclude the trial court's decision to deny Rhonda's motion for mistrial fell outside the zone of reasonable disagreement. *See Carnes*, 2007 WL 2178564 at *2–3. Therefore, we hold the trial court did not abuse its discretion in denying Rhonda's motion for mistrial. We overrule Rhonda's fifth point.

## X.    "Reasonable Doubt" Jury Charge

Rhonda contends in her sixth point that the trial court made a misstatement of law concerning the definition of reasonable doubt in its jury charge. The trial court overruled Rhonda's objection to the following instruction in the court's charge to the jury: "It is not required that the prosecution proves guilt beyond all possible doubt. It is required that the prosecution's proof excludes all 'reasonable doubt' concerning the defendant's guilt."

51

We have previously addressed the propriety of this particular jury instruction on several occasions and have held that the trial court's use of this instruction was not improper. *See, e.g.*, *Gulley v. State*, No. 02-06-00395-CR, 2008 WL 755203, at *6 (Tex. App.—Fort Worth Mar. 20, 2008, pet. ref'd) (mem. op., not designated for publication); *Pope v. State*, 161 S.W.3d 114, 125 (Tex. App.—Fort Worth 2004), *aff'd*, 207 S.W.3d 352 (2006); *Best*, 118 S.W.3d at 865 (holding that merely giving a reasonable doubt definition in a jury charge does not constitute reversible error and that the trial court did not err by submitting a jury charge distinguishing reasonable doubt from possible doubt). Accordingly, we hold that the instruction given was not improper. We overrule Rhonda's sixth point.

## XI. Conclusion

Having overruled Rhonda's seven points, we affirm the judgment of the trial court.

ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

DAUPHINOT, J. filed a concurring opinion.

PUBLISH

DELIVERED: February 18, 2010

52



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-143-CR**

RHONDA ORR                                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## CONCURRING OPINION

------------

I concur in the ultimate outcome, but I write separately in regard to Appellant's second point. When the police directly or indirectly obtain evidence by violating the law, the evidence must be suppressed.[12] But the police did not

---

[12] Tex. Code Crim. Proc. Ann. art. 38.23 (Vernon 2005).

engage the services of an unlicensed person to act as an arson investigator.[13]

Further, Powell did not violate the statute.[14]

The evidence shows that Ms. Poole hired investigator R.D. King, the father of her husband's nephew's wife, to investigate her son's death. In response to a call from King, Powell went to the fire scene and met with Mr. Poole. He walked through the house and did analyses to try to determine the cause and source of the fire. Before that, he had met with fire marshals Wallace and Bowery and examined photographs of the fire scene, concluding that two separate fires had been burning in the room at about the same time. In both instances, Powell simply provided his expertise to help persons lawfully investigating the fire to understand what they were seeing.

I would hold that Powell was not engaged in the investigation business in violation of the statute.[15] He was a retired Florida deputy fire marshal, and employed as a teacher at the time of his assistance, who provided his expertise to both the fire marshals and to the investigator hired by Ms. Poole. As such, he was not working as an investigator as contemplated by the statute.[16]

---

[13] *See* Tex. Occ. Code Ann. § 1702.101 (Vernon 2004).

[14] *See id.*

[15] *See id.*

[16] *See id.*

Powell's role was similar to that of a serologist who performs blood tests to assist the police in investigating a possible criminal offense, and it was similar to that of an art expert who assists the police in determining whether a painting is authentic or a fake. Such experts are not required to be licensed investigators or law enforcement officers. They provide their expertise to assist law enforcement or licensed investigators, and there may be other licensing requirements peculiar to their field of expertise that would go to their qualification as an expert. But providing expertise to an investigator does not make a person an investigator and does not mean that person is engaged in the investigation business.

With these observations, I concur in the majority's thoughtful opinion.


LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: February 18, 2010

3