02-10-362-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00362-CR

 

 


 
 
 Garrett Gower
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM THE 362nd
District Court OF Denton COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          Appellant
Garrett Gower appeals his capital murder conviction, contending in two issues
that he was denied effective assistance of counsel and that the trial court
erred by admitting the testimony and reports of a doctor who was employed by a
private association that was acting as a medical examiner, allegedly in
violation of article 49.25 of the code of criminal procedure.  See Tex. Code
Crim. Proc. Ann. art. 49.25, § 2 (West 2006).  We affirm.

Background
Facts[2]

          In
2009, appellant dated a sixteen-year-old girl named Brittany, and he was often around
her family, including her mother, Judith, and her sister, Crystal.  Toward the
end of October 2009, Brittany learned that she was pregnant, and appellant
conceded to Judith that he was the father.  Brittany and appellant quarrelled
on multiple occasions.  Judith talked to appellant about telling his parents
about Brittany’s pregnancy, but he did not want to do so.

          On
November 9, 2009, appellant had a “kind of heated” conversation with Brittany
and Crystal in which Crystal encouraged appellant to tell his parents about the
pregnancy.  Later that night, Brittany told appellant in a text message that
she was going to tell his mother about the pregnancy.  Appellant responded by
calling Brittany’s cell phone several times in the subsequent early morning
hours.

          Appellant
eventually went to Judith’s apartment and stayed with Brittany on the early
morning of November 10, 2009.  When Judith awoke to go to work, she reminded
Brittany that Brittany’s doctor’s appointment was scheduled for that
afternoon.  Appellant had volunteered to take Brittany to the appointment.  But
neither he nor Brittany ever made it there.  From the doctor’s office, Judith called
appellant’s and Brittany’s phones with no response, and then Judith called
Crystal to ask if she had seen Brittany or appellant.

          Crystal
left work and went home, where she found Brittany lying in their mother’s bed. 
Crystal tried to wake Brittany but could not.  Brittany was dead.  Crystal called
911.  To a responding paramedic, Brittany’s body appeared to be staged; she was
lying flat on her back with her arms at her side, and she had been covered by a
blanket.  Based on the condition of Brittany’s body, the paramedic believed
that Brittany had been dead for a long time.

           Police
officers who came to the apartment did not notice any signs of forced entry,
nor did they believe, from looking at the condition of the apartment, that a
burglary had occurred.  But officers noticed blood matted into Brittany’s hair
mixed with glass on the left side of her head; glass shards from a broken vase
scattered about the room; pieces of glass in the bed; blood on a pillow and the
bed sheets; and cuts on Brittany’s lips, hands, and elbow.  Based on the broken
glass found at the scene, officers believed that whoever had been with Brittany
could have received cuts.  Judith came to the scene, and based on her
conversation with some of the officers and the fact that appellant was the last
person known to have been in contact with Brittany, the officers began to look
for appellant.  A detective eventually found him at a Bedford mental health facility,
and the detective noticed cuts on appellant’s forearm, one of his hands, and
his knee.[3] 
Appellant could not be excluded as a contributor to mixed DNA samples found on
and near Brittany’s body.  Also, a Denton County Sheriff’s Office investigator
discovered appellant’s fingerprints on a broken vase that was close to Brittany’s
body.

          Dr.
Marc Krouse, a chief deputy medical examiner, determined that Brittany had died
in a homicide by suffocation.  Dr. Krouse believed that Brittany had been
pregnant for approximately six weeks when she died.

          A
grand jury indicted appellant for capital murder; the indictment alleged that
appellant had killed Brittany and her unborn child in the same criminal
transaction.[4] 
Appellant pled not guilty.  The trial court appointed John Moore to represent
appellant at trial.  Moore secured the assistance of a second chair for voir
dire.  Moore also sought to quash appellant’s indictment on the grounds that
Brittany’s unborn child was not viable and that the penal code’s section
related to capital murder of more than one person was void for vagueness; asked
the trial court to suppress any evidence seized from appellant because the
evidence was obtained without probable cause and in violation of appellant’s
rights;[5]
filed other pretrial documents, including discovery motions and a motion in
limine; and discussed appellant’s case with appellant, his family, an
investigator, and the district attorney’s office.

          At
trial, Moore asked numerous questions during voir dire, made many objections to
the State’s evidence, extensively cross-examined the State’s witnesses, made an
opening statement, and made a closing argument in which he contended that the
State had not proved capital murder but had presented only “emotions and circumstances”
to the jury.  At the end of appellant’s trial, the jury convicted him of
capital murder.  The trial court sentenced appellant to confinement for life without
parole because the State did not pursue the death penalty.[6]


          Represented
by new counsel (the same counsel that appellant has on appeal), appellant filed
a motion for new trial in which he argued, in part, that he had received
ineffective assistance of counsel.  The trial court denied the motion, finding
that Moore had zealously advocated for appellant at trial and had “tried the
case the best he could with the evidence that was available.”  Appellant
brought this appeal.

Appellant’s
Claim of Ineffective Assistance of Counsel

          In
his first issue, appellant contends that Moore provided ineffective assistance.[7] 
To establish ineffective assistance of counsel, appellant must show by a
preponderance of the evidence that his counsel’s representation fell below the
standard of prevailing professional norms and that there is a reasonable
probability that, but for counsel’s deficiency, the result of the trial would
have been different.  Strickland v. Washington, 466 U.S. 668, 687, 104
S. Ct. 2052, 2064 (1984); Salinas v. State, 163 S.W.3d 734, 740 (Tex.
Crim. App. 2005); Mallett v. State, 65 S.W.3d 59, 62–63 (Tex. Crim. App.
2001); Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App.
1999).  

          In
evaluating the effectiveness of counsel under the first prong, we look to the
totality of the representation and the particular circumstances of each case.  Thompson,
9 S.W.3d at 813.  The issue is whether counsel’s assistance was reasonable
under all the circumstances and prevailing professional norms at the time of
the alleged error.  See Strickland, 466 U.S. at 688–89, 104 S. Ct. at
2065.  Review of counsel’s representation is highly deferential, and the
reviewing court indulges a strong presumption that counsel’s conduct fell
within a wide range of reasonable representation.  Salinas, 163 S.W.3d
at 740; Mallett, 65 S.W.3d at 63.  To overcome the presumption of
reasonable professional assistance, “any allegation of ineffectiveness must be
firmly founded in the record, and the record must affirmatively demonstrate the
alleged ineffectiveness.”  Id. (quoting Thompson, 9 S.W.3d at
813).  It is not appropriate for an appellate court to simply infer ineffective
assistance based upon unclear portions of the record.  Mata v. State,
226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

          The
second prong of Strickland requires a showing that counsel’s errors were
so serious that they deprived the defendant of a fair and reliable trial.  Strickland,
466 U.S. at 687, 104 S. Ct. at 2064.  In other words, appellant must show
there is a reasonable probability that, but for counsel’s unprofessional
errors, the result of the proceeding would have been different.  Id. at
694, 104 S. Ct. at 2068.  A reasonable probability is a probability sufficient
to undermine confidence in the outcome.  Id.  The ultimate focus of our
inquiry must be on the fundamental fairness of the proceeding in which the
result is being challenged.  Id. at 697, 104 S. Ct. at 2070.

Appellant’s arguments that Moore should have
sought a mitigation specialist, jury consultant, and second chair

 

          In
part of his first issue, appellant contends that Moore was ineffective because
he did not obtain a mitigation specialist, jury consultant, or second chair
counsel to assist in appellant’s defense.  In the hearing on appellant’s motion
for new trial, Bridgett Lucchesi, a mental health therapist, testified that she
was trained to be a “mitigation specialist.”  She defined mitigation specialist
as someone who “goes and does the . . . psychosocial history . . . of someone
who is charged with murder.”  She opined that having a mitigation specialist is
important to “understand and know the person that’s committed the crime” and
“provide information for the court . . . that would be helpful in understanding
the case.”  Lucchesi said that she offered Moore her services as a mitigation
specialist and jury consultant but that he did not respond to her; she was
concerned about whether Moore has been “death penalty certified.”

          While
Lucchesi seemed to believe that mitigation specialists are important in death
penalty cases, the State never sought the death penalty in this case.  Moreover,
as Moore stated in the hearing on appellant’s motion for new trial, a
mitigation specialist would have been superfluous given that the automatic
sentence upon a finding of appellant’s guilt was life imprisonment.  See
Tex. Penal Code Ann. § 12.31(a)(2); Tex. Code Crim. Proc. Ann. art. 37.071, § 1
(West Supp. 2010); Prater v. State, 903 S.W.2d 57, 60 (Tex. App.—Fort
Worth 1995, no pet.) (“There is no need to offer evidence of mitigating factors
when no greater punishment than the minimum punishment permitted for the offense
may be imposed.”); see also Teixeira v. State, 89 S.W.3d 190, 194 (Tex.
App.—Texarkana 2002, pet. ref’d) (explaining that to show that counsel was
ineffective for not retaining a mitigation expert, “there must be some showing
in the record that an expert would have testified in a manner that would have
benefitted” the defendant).  Because mitigation was inapplicable to appellant’s
case, we conclude that appellant’s argument that Moore was ineffective by not
retaining a mitigation specialist fails to satisfy either Strickland
prong.  See 466 U.S. at 687, 104 S. Ct. at 2064.

          Appellant
also claims ineffective assistance of counsel on the ground that Moore did not
employ a jury consultant for voir dire.  But appellant has not argued that Moore
had a faulty strategy in voir dire or that Moore performed poorly during voir
dire.  Nor has appellant contended that a characteristic of his case created a
particularized need for a jury consultant.  Thus, to characterize trial counsel
as ineffective for not using a jury consultant calls for speculation, and
“[i]neffective assistance of counsel claims are not built on retrospective
speculation.”  Bone v. State, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002);
see Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994)
(holding the defendant did not meet the first Strickland prong by
speculating that trial counsel provided ineffective assistance for not striking
a venire person).  Nothing in the record suggests that counsel’s voir dire,
taken without the assistance of a jury consultant, led to an unreliable guilty
verdict or that having a jury consultant would have changed the trial’s outcome. 
See Bone, 77 S.W.3d at 834; see also Busby v. State, 990
S.W.2d 263, 271 (Tex. Crim. App. 1999) (holding that a “jury consultant is not
a ‘basic’ tool of the defense.  Selecting a jury is part of an attorney’s
stock-in-trade.  Although a jury-selection expert’s assistance would no doubt
be helpful in nearly every case, such assistance is a luxury, not a necessity.”),
cert. denied, 528 U.S. 1081 (2000).  We conclude that appellant’s
argument about Moore’s alleged ineffectiveness by failing to hire a jury
consultant does not satisfy either Strickland prong.  See 466
U.S. at 687, 104 S. Ct. at 2064.

          Next,
although appellant complains that Moore should have requested a “second chair”
to assist at trial, the record indicates that appellant did have a second
attorney, Chris Jones, during part of the trial, and that Moore paid Jones for
the assistance.  And even if Jones did not assist in other parts of the trial,
appellant cannot establish that the second Strickland prong has been met
because he has not directed us to deficient and potentially outcome
determinative trial tactics by Moore that might have been prevented with assistance
of more attorneys.

Moore’s investigation of the
case

          In
another part of his first issue, appellant argues that Moore was ineffective because
he did not adequately investigate the facts of the offense.  First, appellant
contends that Moore was ineffective because he did not interview Rafe Foreman, who
was present at appellant’s arrest and initially represented appellant but later
withdrew as his counsel.  During the hearing on his motion for new trial, appellant
testified that he told Moore to contact Foreman because Foreman had “certain
information that was relevant and important to the case.”  Moore called
Foreman’s office several times because Foreman may have had knowledge of the
procedure used by officers to collect appellant’s DNA, but Moore never spoke to
Foreman.  Specifically, Moore testified that appellant’s mother had told him
that Foreman had witnessed a police officer clean out a DNA sample jar with his
finger before he took DNA from appellant.  Moore asked appellant whether he had
seen this happen, and appellant said no.  Moore also instructed his
investigator to talk to the police officers that collected the DNA.  And Moore
testified that he felt “satisfied after . . . talking to [the investigator] and
talking to [appellant] and looking at the DNA results” that the officer had not
cleaned out the jar with his finger.  Nonetheless, during the trial, Moore
asked the detective who collected appellant’s DNA whether he had worn gloves
while doing so, and the detective affirmed that he did wear gloves and did not
clean out any vessel with his finger.  Appellant did not call Foreman at the
hearing on the motion for new trial to testify that the detective had indeed cleaned
the jar with his finger, nor did appellant produce evidence indicating that the
jury’s finding of guilt might have changed had the officer done so.  Because
Moore investigated the issue that appellant wanted him to speak with Foreman
about and because the record does not show prejudice from Moore’s lack of a
conversation with Foreman, we cannot conclude that appellant has satisfied
either Strickland prong on the basis that Moore did not talk to Foreman. 
See 466 U.S. at 687, 104 S. Ct. at 2064.

          Appellant
also contends that Moore was ineffective because he did not adequately
investigate whether the apartment complex where Brittany was murdered had
surveillance cameras,[8]
did not research people whom appellant identified as potential suspects in
Brittany’s murder,[9]
and did not independently test DNA or hire an expert to do so.  Even if we were
to conclude that Moore’s performance in these areas was ineffective, appellant could
not satisfy the second Strickland prong because he provides no evidence
showing a reasonable probability that the trial’s outcome would have been
different if his counsel had conducted further investigation:  appellant did
not present surveillance tapes that Moore had overlooked, establish that foreign
DNA or contaminants in the DNA sample caused an incorrect test result, or provide
evidence inculpating someone else in the crime.  Therefore, because appellant’s
speculation does not meet the Strickland standard, we overrule these
alleged bases of ineffectiveness.  See 466 U.S. at 687, 104 S. Ct.
at 2064; Salinas, 163 S.W.3d at 740; see also Ex parte Ramirez,
280 S.W.3d 848, 853–54 (Tex. Crim. App. 2007) (holding that the defendant
failed to establish prejudice by counsel’s failure to review an available
surveillance tape or offer it into evidence because the defendant did not
produce the video, thus failing to show that admitting it would have produced a
different trial outcome); Wilkerson v. State, 726 S.W.2d 542, 550 (Tex. Crim.
App. 1986) (“Since there is nothing in the record to show that . . . a visit to
the scene would have made any difference in the defense’s case, the failure of
the attorneys to visit the scene does not militate against a finding of
reasonable representation.”), cert. denied, 480 U.S. 940 (1987).

The
investigation of appellant’s brain injuries

          Finally,
appellant contends that Moore was ineffective for failing to investigate appellant’s
brain injuries that, according to appellant, could have affected his ability to
appreciate or control his actions.  The record indicates that in the spring of
2009, appellant had a car crash in which he suffered a concussion and injured
his head; a week later, he had a second accident in which he again hit his
head.  During the hearing on his motion for new trial, appellant testified that
he had asked Moore to investigate those brain injuries and to arrange for
appellant to be psychologically evaluated.  Appellant testified that he was
“not sure” whether he had ever been diagnosed with automatism, but he stated
that he had been diagnosed as having a condition that affects his ability to
control his actions.  He said that he had asked Moore to contact Dr. James Barry
with regard to the diagnosis.

          Moore
did not speak with Dr. Barry, was not aware of what automatism is,[10]
and did not review medical records that might have related to appellant’s
mental state at the time of the offense.  Moore testified, “Somebody told me
[appellant had] been in some kind of accident or something like that.  And just
talking to him, I didn’t seem to see there was any evidence that he was not
understanding what I was talking to him about.  So I did not pursue that.”  Upon
receiving appellant’s case, Moore decided that the best trial strategy was to
contest the sufficiency of the State’s evidence against appellant.  In pursuing
that strategy, Moore disregarded alternative defenses that presumed that
appellant had killed Brittany.

          Appellant
has not contended that contesting the sufficiency of the State’s evidence to
convict him was an unreasonable trial strategy.  It would be difficult for him
to do so because he filed his motion for new trial on the basis, among others,
that his conviction was not supported by sufficient evidence.  Appellant
contends on appeal that Moore ignored a viable automatism-related defense.  But
the pursuit of that defense, in which appellant apparently would have admitted
that he killed Brittany but did not realize he was doing so, would have been
inconsistent with appellant’s defense that he did not kill her.  Nonetheless, we
need not decide whether Moore’s representation fell below prevailing
professional norms by Moore not investigating appellant’s brain injuries or
automatism because we conclude that appellant cannot meet the burden imposed by
the second Strickland prong.  At the hearing on his motion for new
trial, appellant offered no psychiatric diagnosis, expert opinion, or any other
evidence indicating that even if he suffered from automatism generally, that
condition caused or contributed to Brittany’s death.  See Conrad v.
State, 77 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2002, pet. ref’d)
(“[T]here was no evidence offered at the hearing on the motion for new trial
that any physician or social worker would have testified that Appellant was
legally insane at the time of the offense. . . .  [W]e cannot say that
Appellant showed the outcome would have been different had trial counsel
performed as the law requires.”).  Appellant did not testify at the hearing on
his motion for new trial that he could not remember what happened on the day
Brittany died or that he remembered killing her but could not control his
actions when he did so; rather, he recalled that Brittany let him out of
Judith’s apartment on the morning of the murder, that he never returned to the
apartment, and that his mother told him about Brittany’s death.  Because
appellant has not shown by a preponderance of the evidence that there is a
reasonable likelihood that the result of his trial would have been different if
Moore had investigated his alleged automatism, we conclude that he cannot
sustain his ineffective assistance claim under Strickland.  See 466
U.S. at 687, 104 S. Ct. at 2064.

          For
all of these reasons, we find no basis to agree with any of the alleged specific
grounds for appellant’s ineffective assistance claim.  Furthermore, considering
the totality of Moore’s representation before and during trial, we hold that
appellant has failed to satisfy the requirements of Strickland.  See
id.; Thompson, 9 S.W.3d at 813.  We overrule appellant’s first
issue.

The
Admission of Dr. Krouse’s Testimony and Reports

          In
his second issue, appellant argues that the trial court erred by admitting the
testimony and reports of Dr. Krouse, the chief deputy medical examiner who
performed Brittany’s autopsy.  We review a trial court’s decision to admit or
to exclude evidence under an abuse of discretion standard. Orona v. State,
341 S.W.3d 452, 464 (Tex. App.—Fort Worth 2011, pet. ref’d).

          Appellant
argues that Dr. Krouse is impermissibly “employed by a business entity acting
as a medical examiner in violation of [article 49.25] of the Texas Code of
Criminal Procedure[,] which requires a medical examiner . . . to be a natural
person.”  Dr. Krouse is not a county employee.  At trial, appellant objected to
Dr. Krouse’s testimony about Brittany’s autopsy on the basis that he is not a
county official and cannot qualify as a deputy medical examiner.  At the
hearing on his motion for new trial, appellant presented evidence that Dr.
Nizam Peerwani’s professional association, rather than Dr. Peerwani himself,
contracts with counties to provide medical examiner services.

          Appellant
argues that article 49.25 of the code of criminal procedure precludes a
business entity from holding the medical examiner’s office.  He contends that
the Tarrant County Commissioners Court exceeded its authority by contracting
with the professional association.[11] 
Thus, appellant contends that because Dr. Peerwani’s professional association
did not qualify as a medical examiner, the evidence gathered by Dr. Krouse, an employee
of the professional association, should not have been admitted.  Section two of
article 49.25 recites, “The commissioners court shall appoint the medical
examiner, who shall serve at the pleasure of the commissioners court.  No person
shall be appointed medical examiner unless he is a physician licensed by the
State Board of Medical Examiners.”  Tex. Code Crim. Proc. Ann. art. 49.25, §
2.  Section fourteen of article 49.25 states that a person commits a Class B
misdemeanor by violating the article.  Id. art. 49.25, § 14.  Article
49.25, however, does not contain any provision that excludes evidence that was produced
through an autopsy that was performed in violation of the article.  Appellant
does not provide authority interpreting the article in that manner, and we have
found none.

          Article
38.23(a) states, “No evidence obtained by an officer or other person in
violation of any provisions of the Constitution or laws of the State of Texas,
or of the Constitution or laws of the United States of America, shall be
admitted in evidence against the accused on the trial of any criminal case.”  Id.
art. 38.23(a) (West 2005).  Despite article 38.23(a)’s broad language, it does
not “confer automatic third party standing upon all persons accused of crimes, such
that they may complain about the receipt of evidence which was obtained by
violation of the rights of others, no matter how remote in interest from
themselves.”  Fuller v. State, 829 S.W.2d 191, 202 (Tex. Crim. App.
1992), cert. denied, 508 U.S. 941 (1993), overruled on other grounds
by Riley v. State, 889 S.W.2d 290 (Tex. Crim. App. 1994)).  “The underlying
purpose of both the federal exclusionary rule and article 38.23 is the same:  to
protect a suspect’s privacy, property, and liberty rights against
overzealous law enforcement.[[12]] 
As such, both exclusionary rules are substantive in nature, as they provide
a remedy for the violation of those rights.”  Wilson v. State, 311
S.W.3d 452, 458–59 (Tex. Crim. App. 2010) (emphasis added) (footnotes and
citations omitted).  Thus, article 38.23(a) “may not be invoked for statutory
violations unrelated to the purpose of the exclusionary rule or to the
prevention of the illegal procurement of evidence of crime.”  Id. at 459;
see Watson v. State, 10 S.W.3d 782, 784 (Tex. App.—Austin 2000, no pet.)
(expressing that article 38.23(a)’s primary purpose is to deter unlawful
actions that violate the rights of criminal suspects); State v. Tyson,
919 S.W.2d 900, 903 (Tex. App.—Eastland 1996, pet. ref’d) (“Tyson does not have
‘standing’ to suppress the evidence under Article 38.23 because none of his
rights were violated in the transaction.”).  In various contexts, courts have
held that alleged statutory violations do not require the exclusion of evidence
when the statute is unrelated to protecting the defendant’s rights.  See
Watson, 10 S.W.3d at 784 (collecting cases that declined to apply article
38.23’s exclusionary rule to alleged statutory violations); Stockton v.
State, 756 S.W.2d 873, 874 (Tex. App.—Austin 1988, no pet.) (determining
that evidence obtained by a undercover narcotics officer who was enrolled in
high school, allegedly in violation of the education code, was not required to
be excluded under article 38.23); see also Andrews v. State, 164
Tex. Crim. 1, 3, 296 S.W.2d 275, 276 (1956) (overruling a defendant’s
contention that testimony from a physician was inadmissible because the
physician conducted a vaginal examination of a rape victim while not licensed
to practice).

          Appellant
does not explain how the arrangement between the counties and Dr. Peerwani’s
professional association, even if possibly violating article 49.25, invades his
rights with respect to his charge for killing Brittany.  Appellant’s argument
in this case is similar to a defendant’s argument in another case decided by
this court, Orr v. State, 306 S.W.3d 380, 400 (Tex. App.—Fort
Worth 2010, no pet.).  Orr argued that the trial court erred by admitting the
testimony of the State’s fire investigation expert because the expert was not
licensed to conduct fire investigations.  Id.  We noted that although
article 38.23 “seems to require exclusion of evidence tainted by every
violation of Texas law, not every violation of law triggers article 38.23’s
exclusionary effect” because “article 38.23’s primary purpose is to deter
unlawful actions that violate the rights of criminal suspects.”  Id.  We
then decided that because Orr did not allege a violation of her rights
related to the fire investigator’s alleged violation of the law, she lacked
standing to challenge the investigator’s testimony under article 38.23.  Id.
at 400–01.

          Similar
to Orr, appellant challenges the admissibility of evidence based on a perceived
violation of statutory qualifications by the person who collected the
evidence.  However, like Orr, appellant has failed to identify a violation of
his own rights as a result of the alleged violation.[13] 
Thus, we conclude that appellant lacks the proper standing to assert a
violation of article 49.25.[14] 
We hold that the trial court did not abuse its discretion by admitting Dr.
Krouse’s testimony and reports, and we overrule appellant’s second issue.

Conclusion

          Having
overruled appellant's issues, we affirm the trial court's judgment. 

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE 

 

PANEL: 
LIVINGSTON
C.J.; GARDNER and MCCOY, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  October 13, 2011









[1]See Tex. R. App. P. 47.4.





[2]Because
appellant does not challenge the sufficiency of the evidence to support his
conviction, we will only briefly summarize the facts of his offense. 





[3]When
appellant went to the facility, he reported that he had attempted suicide three
times in the days preceding his admission.





[4]See
Tex. Penal Code Ann. § 19.03(a)(7)(A) (West 2011).





[5]After
pretrial hearings, the trial court denied appellant’s motion to quash and
motion to suppress.





[6]See
Tex. Penal Code Ann. § 12.31(a)(2) (West 2011).





[7]Although
appellant purports to challenge “the effectiveness of his trial counsel during
the punishment phase of his case,” appellant’s capital murder trial did not
have a punishment phase.





[8]Moore
asked the district attorney’s office whether there were any surveillance cameras
at or near the apartment complex, and someone from the office informed him that
the police had not found any.





[9]Moore
testified that appellant had proposed that either Brittany’s father or her
ex-boyfriend might have been responsible for her murder.  Moore’s investigator
ran background checks on these men, and based on the results of those
background checks, Moore was “completely uninterested in those two people being
. . . the people that might have done it.”





[10]Automatism
is the defense of unconsciousness and is “related to but different from the
defense of insanity.”  Mendenhall v. State, 77 S.W.3d 815, 818 n.4 (Tex.
Crim. App. 2002).





[11]The
record indicates that the professional association performs medical examiner
services for Tarrant, Johnson, Parker, and Denton counties.





[12]The
court of criminal appeals has implied that medical examiners do not qualify as
law enforcement officials.  See Garcia v. State, 868 S.W.2d 337, 342
(Tex. Crim. App. 1993).





[13]We
note that although appellant contests the legality of Dr. Krouse’s status as a
deputy medical examiner under article 49.25, appellant has not contested Dr.
Krouse’s general medical qualifications to render an expert opinion on issues
related to Brittany’s death, nor has appellant argued that the validity of Dr.
Krouse’s findings from Brittany’s autopsy were somehow affected by the fact
that he is employed by the professional association and not directly by the
counties that he serves.





[14]Therefore,
we express no opinion on the legality of the arrangement between Dr. Peerwani’s
professional association and the counties that the association serves.