**Opinion issued January 12, 2016**



In The

# Court of Appeals

For The

## First District of Texas

_____

### NO. 01-14-00597-CR

_____

**JODY WAYNE WHELCHEL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 400th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 12-DCR-059468**

---

## MEMORANDUM OPINION

A jury convicted appellant, Jody Wayne Whelchel, of the offense of arson,[1]

and the trial court assessed his punishment at ten years' confinement. In two points

of error, appellant argues that (1) the evidence supporting his arson conviction was

---

[1]    *See* TEX. PENAL CODE ANN. § 28.02 (Vernon 2011).

legally insufficient because "it does not rise to the level of scientific reliability necessitated by the use of valid scientific methodology," and (2) the court wrongly denied his motion to invoke spousal privilege to prevent his wife from testifying against him.

We affirm.

## Background

Appellant and the complainant, Dondee Whelchel, began dating in 2006, and in January 2007, they moved into a house located at 7018 Sundance Meadows in Fort Bend County. They purchased the house in Dondee's name because appellant's credit was bad. They subsequently married in April 2007. Appellant contributed to the maintenance of the house over the years but the house remained in Dondee's name, and she testified that she was primarily responsible for paying the mortgage on the home and meeting the other financial obligations.

By January 18, 2012, appellant and Dondee's marriage had disintegrated, they had instituted divorce proceedings, and Dondee had asked appellant to move out. Appellant was unemployed but had gone back to school at the Aviation Institute of Maintenance. At that time, appellant was not contributing any financial resources to the home and the house was in foreclosure, but appellant, Dondee, and their two children continued to live there. Dondee also stated that the bank maintained an insurance policy on the house.

2

On the morning of January 18, 2012, Dondee and appellant argued because Dondee wanted appellant to move out, which he refused to do. Dondee testified that appellant told her that "he's not leaving the home, that he would burn the fucking house down" and that "[i]f he had to leave, we all had to leave." She described appellant as "very upset, very angry" at her. Dondee stated that appellant had quit attending classes and did not want her to leave for work, so he took her cell phone. After Dondee dropped their children off at day care and drove to work, appellant "kept calling" her. Dondee testified that she eventually answered the phone. Appellant "sounded crazy, accusing [her] of being with other men," he was more upset than he had been before she left home, and he asked her to leave work and come home. Dondee refused to leave work, and the conversation "kept escalating" until they both got more angry, and appellant threatened a second time to burn the house down. Dondee told him, "Do what you got to do," and hung up the phone.

Appellant called Dondee again, approximately twenty minutes later, and told her that the house was on fire. Dondee testified that she did not believe appellant had actually started a fire and thought that he was still just angry and wanted her to come home. However, she called the police "and they said a 9-1-1 call did come in." She reported to the police that appellant had threatened to burn the house down and then called to tell her the house was on fire. Based on the police department's recommendation, Dondee also called the fire marshal to notify him of appellant's

threats. The fire marshal told Dondee to stay at work until he called her. After the fire was extinguished, the fire marshal asked Dondee to come home and answer some questions and identify property that was damaged by the fire, which she did.

Dondee testified that as she walked through the home, she noticed that all of her clothes had been removed from her dresser and piled in the bathroom and that they had been burned. She stated that, as far as she could discern, it was only her clothes on the floor of the bathroom. Dondee testified that appellant tried to approach her and talk to her "like he never even said that he was going to burn the house down," and he acted "like we were going to go on our merry way and go live somewhere else." Dondee testified, "I told him not to talk to me. He'd just burned my house down." She stated that every room in the house was damaged to some degree either by the fire or by the firefighters' efforts in extinguishing the fire.

Firefighter A. Ramos was the first responder to the scene of the fire. He testified that there was a lot of smoke as he entered the house. He noticed that most of it was coming from the left side of the house where the master bedroom was situated, so he believed "that most of the fire [was] going to be on that side." When he got to the master bedroom door, he "noticed some orange glow, flames coming from my left," which he extinguished with the fire hose. He then continued into the room and "saw some flames, orange glow in the bathroom," which he likewise extinguished. Ramos testified that he never saw any flames on the ceiling. He stated

that he would have noticed if there had been flames above him because "[i]f you've got fire above you, it's going to . . . get behind you. You can get trapped. . . . Stuff can collapse on top of you, just a bunch of reasons." He also testified that after the fire was extinguished he proceeded through the house to "check for hotspots" by "making holes in the wall, the ceiling, just different places . . . to check for hotspots, extensions of the fire getting between the walls."

Kent Rammrath, who at the time of the fire held the rank of captain for the volunteer fire department that responded to the fire, was the on-scene supervisor. When he arrived at the scene, he observed that the fire seemed concentrated on the left side of the house, in the area he later determined was "a closet area that was just off the bathroom . . . of the master bedroom area." He directed the firefighters in suppressing the fire, which was extinguished "pretty quickly."

Rammrath testified that after the fire was extinguished, it was his job to do a preliminary inspection of the property, in part to find any evidence that might indicate the origin or cause of the fire. The firefighters on the scene reported to him that the fire had been located in the bathroom and closet area of the master bedroom, so he walked through that area first. He determined, based on "a heavy, heavy concentration of fire within the closet," that the fire began in the closet area, but he "was not able to properly pinpoint exactly where within that closet area that fire may have started." Rammrath also noticed "a whole pile of clothing that had been placed

5

in the bathtub right outside the door to [the] closet [with the heaviest fire damage]," which he thought was unusual. He also examined the light fixture in the closet as a possible source of the fire, but he was unable to determine whether it was the cause of the fire. Rammrath testified that because he was not able to discern the exact cause of the fire in this case, he left everything as it was and called the Fort Bend County Fire Marshal's office to conduct a further investigation into the cause of the fire.

As part of his investigation at the time of the fire, Rammrath spoke with appellant, who was present when Rammrath arrived on the scene. Appellant told Rammrath that "he was in the bedroom, went into the kitchen, smelled smoke, saw smoke coming from the bathroom; went in, tried to extinguish the fire." Appellant told Rammrath that the fire was too large for him to try to extinguish "with what he had," so he left the house and called for emergency services. He also observed appellant wearing rollerblades "going up and down the street visiting with neighbors" after the fire had been extinguished, and, again, Rammrath thought this was unusual. Rammrath filed a report relating the details of his investigation, stating that he believed the fire originated in the closet area but he could not determine the type of material or source of ignition that caused the fire in the first place.

Investigator Matt Cornell, who in January 2012 was with the Fort Bend County Fire Marshal's office, testified that he began his investigation by meeting with the incident commander, Rammrath, to find out "what's going on, what they've

6

done and the reason really why they want me there." After speaking with Rammrath, Cornell spoke to appellant. Appellant told Cornell that he was at home at the time the fire broke out, working on his computer in the master bedroom. Appellant went to the kitchen to get something to drink, smelled smoke, looked into the bathroom, and saw smoke and fire in the closet. Appellant told Cornell that he first tried to extinguish the fire by throwing a glass of water on it, then "grabbed a bucket and had scooped it into the spa outside" and brought it in to throw on the fire. When appellant realized he could not put the fire out, he left the house and called 9-1-1. However, Cornell was never able to locate the computer appellant claimed to have been using, and he noticed a bucket full of water placed outside the door to the master bathroom when he did his initial walkthrough after the fire was extinguished. Cornell also noticed that the bathtub was full of water.

Cornell testified that he followed the same protocol every time he conducted an investigation, and the standards were set out in the National Fire Protection Standard 921, which was developed by "[a] board of investigators, electrical engineers, insurance representatives" and was commonly used in fire investigations. He walked around the exterior of the house taking pictures, and then he inspected the house's interior covering "the areas from the least burn to the area of most burn." He examined the bedrooms on the second floor and determined that they all had

some smoke damage, but no "fire or flame damage." He then moved on to the master bedroom, where he saw more smoke and heat damage.

Based on his evaluation of burn patterns, "mass loss, depth of char," and other factors, Cornell determined that there were two points of origin for the fire—"one in front of his lavatory [at the entrance to the master bathroom] and on right inside the door of her closet [located inside the master bathroom]." He determined there were two areas where the fire started because, "[f]ollowing the fire patterning and area of most damage, the patterning and char, mass loss [between the two areas], they were not contiguous at all."

Cornell took some samples from the areas of origin to test for the presence of accelerants, and the samples were negative for the presence of any accelerants. A canine was also brought to the scene to check for the presence of certain chemicals, but the dog failed to alert the presence of any of those chemicals. Cornell testified, however, that an accelerant was not necessary to start a fire. He also testified that he examined the electrical outlets, switches, light fixture, and wiring in the areas around the points of origin. There were no signs that the fire was electrical in nature, as all of the wiring and internal structures were intact and did not show signs of "arcing," electrical shorts, or internal heating. He stated that he did not test any of the wiring because "[t]here was no indication of any electrical issues there that would require us . . . to proceed for further testing." Specifically regarding the light fixture in the

8

closet, Cornell testified that "[t]here was no damage there that indicated that the ballast [in the light fixture] was a possible [cause] of the fire" and that all of the damage to the fixture was "external heating" from a fire that started lower down. Cornell also stated that he looked "at all other possible accidental causes," such as candles, combustible substances, or malfunctioning appliances, and he determined "that there were no other possible accidental causes." He concluded that the fire was incendiary, or set on purpose, "by [appellant] for spite and revenge."

Investigator Jeff Brownson, also with the Fort Bend County Fire Marshal's Office, worked with Investigator Cornell and did a separate follow-up investigation. Brownson also determined that there were two places of origin for the fire, concurring with Cornell's conclusion. Brownson also interviewed appellant. He described appellant's demeanor as "smooth, calm," which he thought was unusual given the circumstances. Brownson stated that he brought appellant inside to "reenact his steps prior to the fire." Appellant told Brownson he was working on his computer in the master bedroom and showed the investigators a desk area in the bedroom where "he said he was sitting . . . when he smelled the smoke and discovered the fire." However, the investigators could not find the computer and "wanted [appellant] to show us where it was, and he couldn't provide us that information." The desk area was unburned, so Brownson did not believe the computer could have burned in the fire. He also stated that they never found the glass

9

that appellant claimed to have used in an attempt to put the fire out, but they did find a bucket full of water near the location of the fire. Brownson found that odd because appellant had told him that he tried to put the fire out with a bucket of water. Brownson also found appellant's responses "illogical" in that appellant told him that after smelling the fire, he "went to the bathroom and opened the doors. Which didn't make sense to us because, we've got a fire outside the doors in the bedroom." However, appellant indicated that he only saw one fire in the closet, which contradicted the investigators' findings that there were two points of origin.

Brownson acknowledged that the fire investigators were informed at some point after their initial investigation of appellant's threats to Dondee that he was going to burn the house down. However, Brownson stated that the information did not factor into his overall investigation because "[w]e can't use hearsay stuff from a second person . . . we can only go off the evidence, off the patterns and off the facts." He also stated that he and Cornell had determined that there were two points of origin for the fire before they were told of appellant's threats.

Ramon Menchaca, an independent contractor who completed an investigation for the insurance company in this case, did a separate investigation several days after the fire. He testified that he likewise noted two areas of origin—one at the entrance to the master bathroom and one in front of Dondee's closet inside the master bathroom. Menchaca found no evidence of electrical failure or other accidental cause

for the fires. Thus, Menchaca determined that "[t]here [were] two separate fires, and there's nothing there accidentally that could have started [them] other than somebody flicking their lighter or throwing a match." Menchaca collected samples from the fire, including the light fixture from the closet, the wall outlet from the closet, and floor debris samples, and he recommended that the insurance company have them tested to confirm the absence of accelerants or other causes of the fire. The insurance company declined to do so, and Menchaca's samples were never tested.

After his initial investigation, Menchaca returned to the house and interviewed appellant. According to Menchaca,

> [Appellant] told me that he was working in the master bedroom on the computer and decided to make something to eat. So, he did. He went to the kitchen, made something to eat, and then he decided to have a cigarette, went out the front door, had a cigarette. Then he came back in, and he went upstairs. . . . Then he returned back to the master bedroom to work on the computer, and that's when he noticed or smelled smoke. He walked into the master bathroom and noticed two fires. He tried to extinguish the fires with a cup of water and realized he couldn't do it. So, he went outside, called 9-1-1, and then he recalled that there was a five-gallon bucket in the back yard. So, he went back to get the five-gallon bucket and proceeded to try to put the fire out again, but the smoke was too intense, so he decided to go back outside.

Appellant told Menchaca that he filled the bucket from the bathtub in the master bathroom. Appellant also told Menchaca that "they had been having problems with the breaker tripping to the light fixture in the closet, the female closet, and . . . probably that the light fixture had something to do with the fire in [Dondee's]

11

closet." Appellant did not provide Menchaca with any explanation for the second fire he described.

Menchaca stated that, at the time he spoke with appellant, he had already completed his investigation of the fire and had ruled the light fixture out as a possible cause of the fire. Menchaca also spoke with Cornell after he completed his investigation.

Appellant testified on his own behalf. He stated that on the morning of the fire, he and Dondee had "stopped" the divorce and were attempting to reconcile. Dondee was angry with him because he had not slept in the bed with her, so she "ended up taking off that morning, which kept me from going to school." Appellant testified that he called Dondee repeatedly "to get her to come back and pick me back up, so that we could go about our regular routine, and I could get to school." He denied ever threatening to burn the house down.

Appellant denied that he ever told Menchaca that he observed two fires—he testified at trial that he only ever saw fire coming from the master bathroom where the closet was located. Specifically, he testified that when he entered the master bedroom to work on his computer he first noticed the burning smell and then walked into the bathroom and saw "a glowing coming from the closet." He tried to put the fire out with a glass of water and, when that did not work, he panicked and went outside to call 9-1-1. After calling 9-1-1, appellant remembered that he had a bucket

12

in the yard, so he filled it with water from the Jacuzzi outside and went inside. He stated that the smoke was too thick and he "tried to toss the bucket in the direction of where the fire was and ran out." He stated that he told the firefighters that the flames had engulfed the ceiling and that he saw flames at the light fixture in the closet.

Appellant testified that he found his computer in an upstairs bedroom the day after the fire. He also testified that he wore rollerblades that day because he ran out of the house in flip-flops and his rollerblades were the only thing he saw in the garage that he could put on his feet. He denied rollerblading up and down the street after the fire.

The jury convicted appellant of arson, and the trial court assessed his punishment at ten years' confinement. This appeal followed.

## Sufficiency of the Evidence

In his first point of error, appellant argues that the evidence is insufficient to support his arson conviction.

### A.    Standard of Review

When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Merritt v. State*, 368 S.W.3d 516, 525

(Tex. Crim. App. 2012) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979)). "The same standard of review applies to cases involving direct or circumstantial evidence." *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006).

The jury is the sole judge of the credibility of witnesses and the weight to afford the testimony. *Merritt*, 368 S.W.3d at 525; *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Juries are permitted to draw reasonable inferences from facts as long as they are supported by the evidence presented at trial. *Merritt*, 368 S.W.3d at 525. We determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We presume the jury resolved conflicting inferences in favor of the verdict and defer to that determination. *Merritt*, 368 S.W.3d at 515–26. Each fact need not point directly and independently to the guilt of the accused, so long as the logical force of the probative evidence, when coupled with reasonable inferences to be drawn therefrom, is sufficient to support the conviction. *Evans v. State*, 202 S.W.3d 158, 166 (Tex. Crim. App. 2006) (holding that when verdict results at least in part from jury's consideration of circumstantial evidence, we view evidence "in combination and its sum total," and "[i]t is the logical force of the circumstantial evidence, not the number of links, that supports a jury's verdict").

With respect to this case, a person commits arson if he "starts a fire, regardless of whether the fire continues after ignition, or causes an explosion with intent to destroy or damage . . . any building, habitation, or vehicle . . . knowing that it is insured against damage or destruction," that "it is subject to a mortgage or other security interest," or that "it has located within it property belonging to another." TEX. PENAL CODE ANN. § 28.02(a)(2)(B), (C), (E) (Vernon 2011). A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (Vernon 2011); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). A jury may infer intent from any facts that tend to prove its existence, such as the acts, words, and conduct of the defendant. *Orr v. State*, 306 S.W.3d 380, 394–95 (Tex. App.—Fort Worth 2010, no pet.). "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Id.* at 395 (quoting *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)).

**B.    Analysis**

Here, the complainant, Dondee Whelchel, testified that appellant was angry with her on the morning of the fire. She had asked him to move out and he did not want to. He threatened to burn the house down, saying that "he's not leaving the home, that he would burn the fucking house down" and that "[i]f he had to leave, we

15

all had to leave." He called her repeatedly that morning and they fought again, at which time appellant again threatened to burn the house down. Appellant called Dondee one more time to tell her that the house was on fire. She was skeptical that he was telling the truth, but she called emergency services just to be sure and was told that a fire had, in fact, been reported at her home.

Appellant acknowledged that he was the only person home when the fire started. Furthermore, as indicated by the testimony of firefighter Ramos and Cornell and Brownson with the Fort Bend County Fire Marshal's Office, appellant made inconsistent and implausible statements during the investigation. Appellant testified that he was working on his computer in the master bedroom, but the computer was not present there during the subsequent fire investigation. Appellant testified that he found it upstairs the next day. He claimed that he saw flames engulfing the ceiling, but Ramos testified that there were no flames on the ceiling and that he would have noticed if the fire was burning in the ceiling because it was important for safety reasons. Brownson testified that appellant's interview responses were "illogical" because appellant told them that he "went to the bathroom and opened the doors" once he smelled the fire. Brownson stated that this "didn't make sense to us because, we've got a fire outside the doors in the bedroom."

Appellant told Cornell and Brownson that he emptied a glass of water onto the fire, but the glass was never found. Appellant also claimed to have thrown a

16

bucket of water on the fire—although he was inconsistent regarding where he obtained the water—but the investigators saw a bucket full of water in the bathroom area. Menchaca testified that appellant reported he had seen two fires, which appellant later denied at trial. Finally, the investigators and Dondee testified about appellant's odd demeanor after the fire was extinguished.

Thus, the record demonstrates that appellant had a motive for burning down the house that he had expressed to Dondee on the morning of the fire, he was the only person present at the time of the fire, and he gave implausible or inconsistent statements about how he discovered the fire. This is sufficient evidence of his guilt. *See Guevara*, 152 S.W.3d at 50 (recognizing that attempts to conceal incriminating evidence and implausible explanations to police are probative of wrongful conduct and are circumstances of guilt); *Orr*, 306 S.W.3d at 395–96 (holding that evidence was sufficient to support conviction for arson where appellant had motive, was present at time of fire, and gave implausible explanations about fire); *Fitts v. State*, 982 S.W.2d 175, 186 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (holding that presence at scene before fire coupled with motive, opportunity to set incendiary fire, and inconsistent accounts of fire is evidence tending to establish arson); *Krebsbach v. State*, 962 S.W.2d 728, 734 (Tex. App.—Amarillo 1998, pet. ref'd) (holding that evidence was sufficient to support murder conviction where appellant had motive to

17

set fire, was present in home as fire began, and made inconsistent statements about how she discovered fire).

Appellant argues that the scientific evidence presented by the State's experts was unreliable because "each of the State's experts utilized his own experiences to make a visual inspection of the situs to form his hypothesis that the fire was incendiary" and because they failed to conduct any testing. We observe that appellant waived any complaint about the reliability of the State's experts—Cornell, Brownson, and Menchaca—because he failed to object to their testimony on that basis at trial. *See Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003) (holding that appellant failed to object to reliability of expert at trial and thus had not preserved error for review); *Turner v. State*, 252 S.W.3d 571, 584 n.5 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (holding that appellant waived complaint regarding reliability of expert's testimony when he failed to object on that basis at trial). In fact, he did not object to their testimony as experts on any basis. Accordingly, we consider his arguments solely as they relate to the sufficiency of the evidence.

The record demonstrates that the Fort Bend County Fire Marshal's office tested samples from the fire and determined that no accelerant was used. Cornell testified, however, that the lack of accelerant did not mean that the fire was not deliberately set. All three experts relied on established fire investigation protocols

that have been used in other arson cases in this state. *See, e.g.*, *Tata v. State*, 446 S.W.3d 456, 465 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (fire investigator "testified about general standards used by fire investigators promulgated by the National Fire Protection Association, NFPA 921" and describing investigation substantially similar to one conducted here); *see also Merritt*, 368 S.W.3d at 517–19 (describing investigation of vehicle fire by Fort Bend County Fire Marshal's Office conducted using similar methods and holding evidence sufficient to support arson conviction). All three experts concluded that there were two sites of origin for the fire, and they ruled out other possible accidental causes of the fire by inspecting the wiring and other surroundings in the area of the fire. Specifically, Cornell offered lengthy testimony about the condition of the electrical wiring in the master bathroom area and used pictures of the wires and fire damage to explain why the electrical outlet and light fixture were not the source of the fire and instead were only slightly damaged by external heat. He testified that he did not test any of the wiring in the light fixture or outlet in the closet because there were no indications that those mechanisms were a potential cause of the fire.

We conclude that the evidence was legally sufficient to support appellant's conviction. We overrule appellant's first issue.

## Spousal Privilege

In his second issue, appellant argues that the trial court erred in denying his motion to invoke spousal privilege and compelling Dondee, his ex-wife, to testify regarding interactions they had on the day of the fire while they were still married.

Prior to Dondee's testimony, appellant moved to invoke spousal privilege and prevent Dondee from testifying. Dondee, who lived in Oklahoma at the time of the trial, was subpoenaed to testify for the State, and she stated on the record that she did not want to come testify. However, she never asserted spousal privilege and stated on the record that she was not aware of such a privilege. Appellant now argues that the trial court erred in denying his motion to invoke spousal privilege and forcing Dondee to testify.

"In a criminal case, an accused's spouse has a privilege not to be called to testify for the state." TEX. R. EVID. 504(b)(1). "The privilege not to testify may be claimed by the accused's spouse or the spouse's guardian or representative, but not by the accused." *Id.* 504(b)(3). The record demonstrates that Dondee did not claim her privilege not to testify, and, under the express language of Rule 504(b)(3), appellant may not invoke it. We conclude that the trial court did not err in denying appellant's motion to invoke spousal privilege.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Bland.

Do not publish. TEX. R. APP. P. 47.2(b).