

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00016-CR

_____

CHARLES RAY HUNTER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 97th District Court
Archer County, Texas
Trial Court No. 2020-0030A-CR

---

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

On April 19, 2020, at 4:30 p.m., five men in a dark blue SUV drove down Half House Road, a dead-end dirt road in Archer County. Only four men came back.[1] One of the passengers, John Helms, was left behind at the end of the roadway after having been savagely beaten and stabbed five times in his back. His corpse was later discovered in a puddle of blood.[2] According to the State's theory of the case, Helms was beaten and stabbed to avenge his theft of Appellant Charles Ray Hunter's girlfriend's hat and shoes.

Hunter was one of the SUV's passengers that day. He and two others—Saconn Ayala (another passenger) and Lee Villapondo (the driver)[3]—were charged with having murdered Helms by stabbing him with a knife or striking him with their

---

[1]The trial court admitted into evidence surveillance video from a company at the corner of Highway 281 and Half House Road that showed the blue SUV's path.

[2]Someone later attempted to burn the SUV, which was found the following day in another isolated, rural area.

[3]The fourth passenger, Steffen Cary, was not charged, and no one alleged that he had participated in the beating or stabbing. Cary testified that Ayala, Villapondo, and Hunter had beaten Helms with their hands and feet and that Hunter had an orange-and-black knife in his hand when he got back into the SUV. Villapondo died before Hunter's trial.

hands or feet.[4]  After jury selection but before the trial began, the trial court granted Hunter's motion in limine as to evidence of extraneous offenses or prior convictions.

But on the first day of trial, in violation of the limine order, witness Sierra Sears mentioned "people . . . who [Hunter] had robbed."  Hunter objected.  The trial court sustained the objection and granted Hunter's request for an instruction to disregard but denied his motion for mistrial.  After a four-day trial, the jury found Hunter guilty and assessed punishment at confinement for life and a $10,000 fine.  The trial court entered judgment accordingly.  *See* Tex. Penal Code Ann. §§ 12.32, 19.02.

In a single issue, Hunter complains that the trial court abused its discretion by denying his requested mistrial.  Because the record reflects otherwise, we affirm.

## II.  Discussion

Hunter contends that the trial court abused its discretion because before Sears's comment, the prosecutor had repeatedly used robbery as an example during voir dire, and then afterwards, during jury argument, she alluded to the extraneous robbery offense.  Hunter asserts that the trial court's instruction to disregard was thus insufficient to cure the harm caused by disclosing the extraneous offense to the jury.

---

[4]The medical examiner ruled Helms's cause of death as both sharp-force and blunt-force injuries because while the stab wounds caused a lot of internal bleeding, Helms's blunt-force injuries also caused blood loss.

3

## A. Background

### 1. Voir dire

During voir dire, the prosecutor used hypotheticals involving a robbery offense to demonstrate accomplice-witness corroboration, starting with an example in which "Fred and Barney[5] decide[] to rob the convenience store." In the example, "Fred goes in and sticks up the clerk. Barney drives the getaway vehicle. Barney cuts a deal to testify against Fred. Is Barney an accomplice?" The venire panel agreed that Barney was an accomplice, and then the prosecutor elaborated that under the accomplice-witness-testimony rule, "there has to be some other evidence besides what [Barney] says that tends to connect Fred to the crime."

After the venire panel listed video surveillance, fingerprints, other witnesses, and DNA as potential corroboration sources, the prosecutor moved on to statements against penal interest as corroboration, again using robbery as the hypothetical crime:

> Fred and Barney rob the convenience store, the same deal, . . . except Barney admits to the detective at the police station that they planned the robbery of the 7-Eleven, [he] drove the vehicle, Fred went into the store, they split the profits. And at trial, the prosecution offers Barney's out-of-court statement to detectives against Fred. Does that implicate him in that?

Having apparently confused the potential jurors, the prosecutor tried again, stating,

---

[5]Fred and Barney are cartoon characters from *The Flintstones*, an animated sitcom from the 1960s. *See* https://en.wikipedia.org/wiki/The_Flintstones (last visited May 18, 2023).

So Fred and Barney decide[] to rob a convenience store. Fred goes in and sticks up the clerk, Barney drives the getaway vehicle and he tells detectives, hey, we went in and we planned it, I drove the getaway vehicle, Fred went into the store, we split the profits. We would offer that out-of-court statement to detectives against Fred. That's a statement against Barney's penal interests. He's involved, yes. He's there. But hi[s] admitting to his involvement and what he did in furtherance of that crime, [sub]jects him to, potentially, go to prison. It's not -- obviously, in something like that, he's not trying to shift the blame. He's saying I did these things. He can, essentially, go to prison for it. Robbery is a felony. Do you understand how . . . it's not the same type of corroboration as before because in this case, he's actually saying he participated.

Then, again using robbery as an example, the prosecutor turned to admission by silence, stating,

So Fred and Barney rob the convenience store and then back at the rock place where they work[, and] in front of Mr. Slate, Barney begins to talk about what they did. He says we robbed a convenience store and this time Fred has killed the clerk for this example and they say this in front of Mr. Slate at the rock place. Barney tells about he and Fred robbed it. And the details, Fred blew the clerk away all of that. Fred's present and Barney is telling Mr. Slate all of this. [Fred] doesn't say anything. Do y'all see how that can be an adoption by silence? What are you going to do if someone is telling a story like and says, yeah, yeah, me and so-and-so went down and robbed a store and he blew them away and yada, yada, yada? What are you going to do in that situation?

The prosecutor explained that because a person who was not guilty would disclaim having committed the crime, "that's what that rule is, an admission by silence. You don't say anything whenever someone is saying that you committed this crime and you're there." She then turned to the law of parties, using the convenience-store example to explain how a getaway driver could "step into the shoes of the person who is in the store even though they're not inside."

5

She next asked whether the venire panel thought robbery was a violent felony and stated that violence could be involved in a bank robbery, a drug deal, or a rape and could result in a party-liability situation.

### 2. Sears's testimony

Sears was the State's sixth of eight witnesses during the trial's first day and of fifteen witnesses before the State rested and the defense called Hunter to testify. Hunter's objection, request for instruction to disregard, and motion for mistrial occurred as follows during the prosecutor's second redirect examination of Sears:

Q. How would you describe [Hunter's] personality?

A. He was very quiet. He kept to himself a lot. But he was very -- he liked to talk himself up a lot.

Q. What do you mean by that?

A. He just kind of painted a picture of himself as -- like he talked about all of the things -- people he had beat up before, who he had robbed or --

[Defense]: I'm going to object, Judge. This is extraneous conduct. They didn't approach the bench and I object to it.

THE COURT: Sustained.

[Defense]: I would ask [that the] jury be instructed to disregard that testimony.

THE COURT: The jury is so instructed to disregard the last testimony.

[Defense]: Judge, I would move for a mistrial.

THE COURT: Denied.

Q. [Prosecutor]: Ms. Sears, when you talk about the defendant talking a big game, did it -- based off of your experience when he was talking during those times, did it seem like he was trying to act tough?

A. Uh-huh, yes.

Q. Trying to prove he was tough?

A. Yes.

Hunter did not object to this additional testimony. Hunter also did not object to Sears's testimony during the prosecutor's first redirect examination that, based on her experience in the criminal community, people try to act tough "[a]ll of the time."

### 3. Other evidence

In addition to the portion of Sears's unobjected-to testimony above, Hunter did not object when Helms's girlfriend Sarah Fanchier testified about how, in their crime-and-drug-laden world, people tried to act tough, or when Ayala stated that, in that environment, "[Y]ou're either [a] predator or you're prey," and that avenging a theft is "something you take care of yourself."

Further, Hunter was interviewed by Texas Ranger Matt Kelly and Investigator Chris Hamilton, and that interview was recorded, admitted into evidence, and published to the jury. In the interview, Hunter stated that he had to "take up for [his fiancée Rae Lee Malone] and that he had offered to "whoop" Helms for Malone if Helms did not return Malone's belongings. In his testimony during the defense's

case, Hunter denied that he had been trying to look tough and make a name for himself when he participated in Helms's beating.

Because Hunter opted to testify in his own defense, the State was allowed to ask him about his criminal history, and Hunter admitted that he had been convicted of engaging in organized crime with the underlying offense of burglary of a habitation and that he had pleaded guilty to that offense in exchange for a 15-year sentence. Other than Sears's brief reference to Hunter's having committed robbery, there was no evidence presented that Hunter had committed robbery.[6]

### 4. Jury charge

No one objected to the charge, which contained an instruction on the law of parties and on accomplice-witness corroboration and which identified Ayala as an accomplice as a matter of law. Contrary to Hunter's assertion in his brief that the charge contained no limiting instruction on extraneous offenses, the charge contained an instruction informing the jurors that if there was any testimony regarding Hunter's having committed any crime, wrong, or act other than the offense alleged against him in the indictment, they could not consider that testimony for any purpose unless they found and believed beyond a reasonable doubt that he had committed such other crime, wrong, or act and then could consider it only in determining motive,

---

[6]The other mention of robbery during the trial was Ayala's testimony that before Helms's murder, Ayala had been to prison for robbery and burglary and had served a total of 15 years' confinement.

8

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or his state of mind.

### 5. Closing arguments

The prosecutor initially argued that Hunter had admitted to participating in Helms's beating, which the medical examiner had testified was part of what killed Helms and that there was also extensive evidence that Hunter had stabbed Helms. The defense then countered that while Ayala and Villapondo had a motive to kill Helms, Hunter did not. The defense further argued that Hunter had lacked the intent to promote or assist the commission of murder.

In the State's rebuttal in closing, the prosecutor touched on motive, intent, and Sears's unobjected-to testimony, stating,

> Let's talk about motive. The defendant kind of touched on this. We don't have to prove motive, but he told you exactly why he killed [Helms]. *[Sears] said he was always trying to talk himself up and be a tough guy.* Rae Lee said that when she asked him what happened, his response -- this is after he's killed [Helms] -- he says, I take care of my own. In his interview, he told the ranger and Investigator Hamilton, he had to take up for [Malone,] his fiancee. Y'all know the motive. You know that Charles Hunter stabbed . . . Helms five times in the back because [Helms] disrespected his girl by stealing her hat and shoes. [Emphasis added.]

A few minutes later, after discussing other evidence of Hunter's guilt, the prosecutor again referenced Sears's unobjected-to testimony,[7] stating,

---

[7]Hunter complains, "Although the State in closing did not directly reference the testimony regarding the robbery, it did reference Ms. Sears'[s] testimony immediately before and after that statement," which he argues, "would almost by definition have

9

This defendant, along with Ayala and Villapondo[,] brought [Helms] to Archer County to Half House Road to die in your community. He knew exactly what he was doing whenever he murdered [Helms]. At a minimum, when you stab someone, you know you're committing an act that's clearly dangerous to human life. But like we've been saying this whole time, we've proven that Charles Hunter intended to kill [Helms]. This man here, this is a cold-blooded killer. *He told you he was trying to be a tough guy. Rae Lee -- or [Sears] told you that.* We'll see how tough he really is whenever you find him guilty. And this was three against one. And then he also told you, he kicked [Helms] while he was down. [Emphasis added.]

Hunter did not object during closing arguments.

## B. No error or harm

A witness's inadvertent reference to an extraneous offense is generally cured by a prompt instruction to disregard. *Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009); *Barney v. State*, 698 S.W.2d 114, 125 (Tex. Crim. App. 1985) ("Except in extreme cases, if a timely objection to the [improper] remark is sustained, and the trial court instructs the jury to disregard, the error is cured."). We presume the jury followed the trial court's instruction to disregard in the absence of evidence that it did not. *Orr*, 306 S.W.3d at 404.

The record reflects that Hunter received a prompt instruction to disregard during the portion of Sears's testimony at issue. At that point in the trial, the only

---

the jurors recall the offending statement as well." But this argument invites us to ignore the presumption that the jury followed the trial court's instructions in the absence of evidence to the contrary. *Orr v. State*, 306 S.W.3d 380, 404 (Tex. App.—Fort Worth 2010, no pet.) (*Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998); *Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988)).

other mention of robbery had been during the prosecutor's unrelated voir-dire hypotheticals, and there is no indication in this record that the jury failed to follow the trial court's instruction to disregard or the limiting instruction in the jury charge.

Furthermore, we review the denial of a motion for mistrial for an abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699 Tex. Crim. App. 2007). A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Young*, 283 S.W.3d at 878. With regard to a witness's inadvertent reference to an extraneous offense, a mistrial should be granted only in cases where the reference was "clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds." *Id.*

Hunter did not object to Sears's testimony that he had talked himself up to try to act or prove that he was tough. Because Hunter's sole issue pertains to a single mention of robbery in an answer that was nonresponsive to the prosecutor's question, the trial court did not abuse its discretion by denying the motion for mistrial.

Further, on this record as a whole, Sears's sole mention of robbery in a nonresponsive answer could have had no "substantial and injurious effect or influence in determining the jury's verdict."[8] *See Haley*, 173 S.W.3d at 518; *see also King v. State*,

---

[8]In determining harm, we have considered (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of

11

953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). The jury watched Hunter's recorded interview, in which he denied any involvement in the murder or ownership of an orange-and-black knife like the one that was allegedly used to stab Helms.[9] The jury was able to compare the interview against Hunter's trial testimony during which he admitted that he had participated in the beating that, according to the medical examiner, was partly responsible for Helms's death, and during which he admitted that he owned an orange-and-black knife, although he denied having used it to stab Helms. Because the jury could have chosen to believe that Hunter participated in Helms's death—either by stabbing him or by beating him, or both—Sears's single unsolicited remark about robbery had no bearing on his murder conviction.

---

error, *see Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021); *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002), as well as the jury instructions, the State's theory and any defensive theories, closing arguments, and voir dire, *see Haley v. State*, 173 S.W.3d 510, 518–19 (Tex. Crim. App. 2005); *Motilla*, 78 S.W.3d at 355–56.

[9]The trial court allowed the State to use as a demonstrative exhibit an orange-and-black knife matching witness testimony about the one that had been used to stab Helms and then discarded.

## III. Conclusion

We overrule Hunter's sole issue and affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 25, 2023